UNITED STATES of America,
Plaintiff-Appellee,

v.

Billy GRAY, Defendant-Appellant.

No. 77–5164.

United States Court of Appeals,
Fifth Circuit.

Jan. 4, 1978.

Rehearing Denied Feb. 1, 1978.

Phillip E. Kuhn, Memphis, Tenn., for defendant-appellant.

J. V. Eskenazi, U. S. Atty., Marsha L. Lyons, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, RONEY and FAY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Gray appeals from his conviction for wire fraud and conspiracy. He raises ineffective assistance of counsel, continuance, pre-indictment delay, and *Miranda* issues, and also claims that the District Court's imposition of a nine-year sentence was an abuse of discretion. Finding merit in none of these claims, we affirm. But in doing so we think it helpful to present in greater detail than usual the developments at the trial.

### Promises, Promises

On July 28, 1975, Gray, a lawyer, and Frank Peel, using the name John Justin, made and caused to be made a series of phone calls from Peel's office in Tennessee to William Ponsoldt who tape recorded the conversations. Ponsoldt was under indictment in the Southern District of Florida. Gray and Peel told Ponsoldt that they were aware of the charges pending against him and that they would use their influence with various public figures to "fix" his case in exchange for $150,000. Between them,

Gray and Peel immodestly claimed knowing or having close connections with Senators Baker, Brock, Eastland, and Stennis, former Senator Sam Ervin, Representative Jamie Whitten, Sr., former Watergate Special Prosecutor James Neal, and Jamie Whitten, Jr., the Assistant U.S. Attorney in charge of the Ponsoldt prosecution.

Ponsoldt made copies of these tapes [1] and gave them to his attorney who, in turn, passed them on to the FBI. Pursuant to arrangements made with the Bureau, Ponsoldt called Gray and proposed a meeting. On August 13, 1975, Gray flew to Miami and at a designated hotel met with FBI Agent Peisner who was posing as Ponsoldt.[2]

During their conversation Gray made many incriminating statements which need not be detailed here. However, the following is noteworthy. Gray stated that John Justin (the pseudonym Peel used) was not present because he had to run some errands for Senator Eastland. Gray promised to donate his full time to Ponsoldt's problem. He stated that he was traveling to Honduras for a scuba diving expedition with one of the three appeals court judges who would hear Ponsoldt's appeal if he was convicted. Peisner-Ponsoldt told Gray that as long as he knew that Gray or John [Justin-Peel] could fix his case, he would feel much better about turning the money over to

him. Gray responded that he would sign a note for the money and "after the case is taken care of, we'll figure out what it was worth." Tr. 362.

When the conversation ended, Gray was arrested. Peisner, acting in the best Boy Scout tradition, had prepared for the meeting by wearing a body recorder. The entire conversation was taped.

### Pretrial

Gray and Peel were first charged with extortion (R. 19), but the complaint was withdrawn on September 2, 1975. The government continued its investigation. Tr. 425; January 31, 1977 hearing, Tr. 13. In March 1976, Peel-Justin died. On August 26, 1976, a seven-count indictment [3] was returned against Gray charging him with wire fraud in violation of 18 U.S.C.A. § 1343,[4] aiding and abetting Peel to commit that offense in violation of 18 U.S.C.A. § 2, and conspiracy to commit that offense (18 U.S.C.A. § 371).

On October 20, 1976, the defendant moved to dismiss the indictment based on prosecutorial delay which allegedly prejudiced Gray due to the intervening death of Peel. This motion was denied on the first day of trial without prejudice to renewal after the close of the government's case. Tr. 19.[5]

1. Ponsoldt kept the original tapes in his safe deposit box until they were turned over to the FBI shortly before trial.

2. Gray had never met Ponsoldt. He had first talked to Ponsoldt by phone earlier that month. At that time Gray was attempting to arrange a loan and Ponsoldt's name had been suggested to him as a possible source of funds. Tr. 512–15.

3. One count was subsequently dismissed. The five substantive counts were tied to five telephone conversations between Ponsoldt and Peel or Gray during the evening of July 28 and after midnight on July 29.

4. **§ 1343. Fraud by wire, radio, or television**
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or tele-

vision communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

5. When defense counsel renewed this motion, two witnesses' testimony was proffered. Mr. Sisson stated to the Court:

 One of the witnesses . . . would testify substantially that he has had discussions with the deceased, Mr. Peel, and that Mr. Peel explained certain things to him that Mr. Gray did not know what was going on in Miami; that he had done some things that he should not have done in an intoxicated condition that he was going to see that the authorities cleared Mr. Gray, because Mr. Gray did not know anything about it.

 . . . [A]nother witness . . . will testify that he also had a conversation with Mr. Peel; he does not know Mr. Peel, and

On October 29 the government moved to take the depositions of Senators Baker, Brock, Eastland, former Senator Ervin, and Congressman Jamie Whitten, Sr. Following opposition by the defendant, the Court denied the motion.

### The Trial

On Monday, December 13, 1976, defense counsel Sisson moved for a continuance. The first basis put forth was difficulty encountered in locating three defense witnesses. Tr. 5–10. The second basis was Sisson's physical condition. He was losing his voice and thought he was coming down with the flu. Tr. 10–11. The government opposed continuance, citing first, a lack of due diligence and a showing as to the materiality of the witnesses' testimony, and second, the peculiar problems in scheduling the appearance of the public figures.

In an apparent effort to bolster his position on the continuance motion, Sisson made a proposal which was resolved as follows:

> MR. SISSON: . . . Miss Lyons [government counsel] has previously requested my motion to either have a deposition of the senators taken or for me to stipulate that Mr. Gray does not know them personally. At this point, if this will assist, because I do not feel I can go further, then we can dispense either with bringing them down by either deposition or by stipulation. I think that would solve a great deal of that problem.
>
> THE COURT: Miss Lyons? Is this—
>
> MISS LYONS: Your Honor, I am really offended by counsel's tactics here. It seems like counsel is trying to bargain with the Court. I made this motion and I have asked counsel repeatedly to stipulate to these matters and he has repeatedly said that he would not. In fact, he wrote me a letter stating that he could not stipulate because he believed that Frank Peel did know several of the sena-

tors and he named them. I think at this point, the arrangements have been made, the trial is ready to proceed, and I don't understand—

> THE COURT: All right, the motion is denied at this time.

Tr. 20–21.

Counsel for both sides made their opening statements. The first government witness, a supervisor with South Central Bell Telephone in Memphis, verified the phone records of toll calls made from Peel's office. Cross-examination of this witness ended the morning session.

After lunch, Sisson moved for an adjournment. He was feeling much worse. The Court suggested that possibly Sisson's young associate, David Bales, could take over. Sisson responded that Bales knew nothing about the case. The Court agreed to an adjournment until Tuesday so Sisson could see a doctor and suggested that Bales could handle the testimony of the public figures now that Sisson was willing to stipulate to their testimony. Sisson indicated that his primary concern was legal arguments over the tapes. Tr. 44–48. He went on to state:

> [H]e [Bales] can handle that phase of it, because there will be very little cross examination as to Mr. Gray. I do know the information I have that the deceased [Peel] . . . may have known these people.

Tr. 49. The Court stated that Bales could attempt to develop that Peel knew the public officials and the Judge offered to help in any way he could. Sisson stated, "He [Bales] can certainly handle that phase of it." *Id.*

On Tuesday, December 14, Bales reported to the Court that Sisson had seen a doctor and was diagnosed as having a virus and high blood pressure. Sisson was suffering from nausea, shortness of breath, dizziness and chest pains. Tr. 60–63. The Court proposed continuing with the testimony of

---

Mr. Peel told him something similar to that, that this whole thing—that he had gotten Billy Gray into a lot of trouble and that he

would have explained it out with the authorities. . . . .
Tr. 426–27.

the public figures who were "rather perfunctory witnesses" and appointing a federal public defender to assist the defense. Tr. 63. Bales agreed to the appointment. Tr. 68.

Senator Eastland was called to the stand. He testified that he did not know and had never talked to Peel, Justin or Gray.[6] The defense did not cross examine.[7]

Representative Jamie L. Whitten of Mississippi testified that he did not know Peel, Justin or Gray. On cross-examination, it was brought out that the Congressman knew the name Peel but did not know any individuals in the Peel family.[8]

James F. Neal testified that he did not know Peel or Justin, had no recollection of knowing Billy Gray, and did not recognize Gray in the courtroom. Bales cross-examined Neal, and because he wanted to exceed the scope of direct, he made Neal a defense witness.[9]

At this point, public defender Sakowitz entered the courtroom. After explaining Sisson's illness and discussing how the trial should proceed, the Court confirmed the fact that Gray wished the public defender to assist the defense. Tr. 89–93. Sakowitz agreed to proceed as outlined by the Court.

Jamie Whitten, Assistant U. S. Attorney who prosecuted the Ponsoldt case, then testified that he did not know Peel, Justin or Gray. Bales did not cross-examine.[10]

Senator Howard Baker testified that he did not know Peel, Justin or Gray. Bales made the Senator a defense witness in order to exceed the scope of direct and conducted a fairly extensive cross-examination which failed to establish a Baker-Gray connection.[11] Court adjourned at 12:55 p. m.

Bales reported at the beginning of the session on Wednesday that Sisson had overexerted himself conferring with Sakowitz the previous day but that he would attempt to return to court that afternoon after seeing another doctor.

Senator William Brock then took the stand and denied knowing Peel or Justin. He may have known Gray in the past although he did not recognize his name when he was first asked about the matter. The Senator may have met Gray during the course of a political campaign but he never had a close relationship with him. The defense did not cross-examine.[12] Former Senator Sam Ervin did not know Peel, Justin or Gray, and he was not cross-examined.[13]

The public figures' testimony having been concluded, attention focused on how to proceed. The Court decided to adjourn, to get a report on Sisson's condition the next day (Thursday), and if he was not improved by then, to adjourn until Monday thus giving Sakowitz and Bales five days to prepare and Sisson five days to recover. Tr. 151–52.

Bales reported on Thursday, December 16, that Sisson's illness had been diagnosed as acute purulent bronchitis. After an extended discussion concerning Sisson's condition and the evidentiary aspects of the tape

---

6. Senator Eastland's testimony comprises just over two pages of transcript. Tr. 69–71.

7. Bales demonstrated immediately that he was not totally inexperienced. When the District Court thanked Senator Eastland for coming and stated, "you ladies and gentlemen are seeing this morning one of the most important United States Senators in the Congress of the United States," Bales objected. The Court sustained the objection and instructed the jury that Senator Eastland's credibility was entirely a matter for its judgment and discretion. Tr. 71–72.

8. Congressman Whitten's testimony comprises 5½ pages of transcript. Tr. 72–77.

9. Neal's testimony, excluding intervening colloquy, comprises about 6 pages of transcript. Tr. 77–86.

10. Whitten's testimony comprised about three pages of transcript. Tr. 114–17.

11. The Senator's testimony comprises approximately 12 pages of transcript excluding colloquy. Tr. 118–33.

12. Senator Brock's testimony comprises about 2½ pages. Tr. 139–41.

13. His testimony is four pages in length. Tr. 142–46.

recordings,[14] court adjourned until the following Monday.

When Sisson returned to the trial on Monday, December 20, he reported that he was "not 100%" yet but feeling better. Tr. 202. The trial proceeded uneventfully with Sisson as lead counsel. Sakowitz assisted the defense on Monday, Tuesday, and part of Wednesday. Bales handled the examination of the character witnesses. The jury returned a verdict of guilty on Wednesday night, December 22.

### Post-Trial

On January 31, 1977, the date set for sentencing, the Court allowed counsel to argue its motion for a new trial based on ineffective assistance of counsel. Gray's new and present lawyer, Kuhn, put Sisson, Bales, and Gray on the stand.

Sisson recounted the extent of his pre-trial preparation of the case and stated that he did not effectively represent Gray. Bales reiterated his complete lack of familiarity with the case and with federal court practice.[15] Neither Sisson nor Bales was asked what could have been done to defend Gray that was not done, and neither volunteered an opinion on that score. Gray testified that Bales and Sakowitz were not counsel of his choice. Kuhn asked Gray what steps could have been taken that were

not. He replied that he was under the impression that an FBI lab man[16] was going to be subpoenaed and that counsel had issued subpoenas for two other witnesses.[17] Hearing Tr. 73.

On March 3, 1977, the District Court held a sentencing hearing. Kuhn urged a probated sentence, arguing that (i) Gray had practiced law for ten years and had no prior criminal record; (ii) it was highly unlikely that he would ever be involved in such activities again; (iii) he had been suspended from practicing law and disbarment would follow if appeals were unsuccessful, which was sufficient punishment; and (iv) financial reverses had provided the provocation for Gray's conduct. The government recommended a period of incarceration. The Court imposed an eighteen-month sentence as to each of six counts to run consecutively for a total of nine years.

### The Sixth Amendment And Continuance Claims

Appellant contends that the trial court's failure to grant a continuance under the circumstances amounted to an abuse of discretion. He urges that he was denied effective assistance of counsel by being forced to trial with attorneys who were not counsel of his choice, who were totally unfamiliar with his case, and who had too little time to

14. Bales and Sakowitz continued to emphasize that Sisson was the only attorney familiar with the case. Sakowitz made a proposal, which involved a mistrial and an agreement to use the public figures' testimony at the second trial. In attempting to keep the trial on the track, the District Court cut through to the heart of the matter. All the critical evidence was on tape. Once a proper predicate was laid, it was a simple matter to play the tapes for the jury. Tr. 178–80. The Court stated:

> . . . I just do not see where there is any serious evidentiary problem that would require the unique expertise of Mr. Sisson. I really think that any experienced defense counsel could come in here without regard to any of the merits of what is on the tapes and deal with the problem of the admissibility of the tapes.

Tr. 178–79.

15. Bales had joined Sisson in Miami to help with research and last-minute details. He had done no previous work on the case. Before

going into private practice, however, Bales had served as an Assistant Attorney General in Tennessee from April 1974 through January 1976 and had prosecuted both felony and misdemeanor cases, primarily involving burglaries and armed robberies. January 31, 1977 hearing, Tr. 39, 57–58, 63.

16. Although the record is far from clear on the point, it seems that the FBI made a voice analysis of the Ponsoldt phone tapes which failed to establish conclusively that Gray's voice was on the tapes. Tr. 243–44. Nonetheless, Gray admitted talking to Ponsoldt by phone in Peel's office the evening of July 28. Tr. 532–33, 536–37, 571–75, and the District Court could have reasonably concluded that the failure to subpoena the FBI lab man did not demonstrate the ineffectiveness of counsel's assistance.

17. These witnesses' names were not stated, and no proffer as to what their testimony might be has yet been made.

prepare. He also claims that Sisson was not up to par and was ineffective on the first day of trial and during the second week when he returned.

■ We begin with the settled principle that the right to counsel of one's choice is not absolute as is the Sixth Amendment right to the assistance of counsel. *United States v. Sexton*, 5 Cir., 1973, 473 F.2d 512; *United States v. Harrelson*, 5 Cir., 1973, 477 F.2d 383, *cert. denied*, 414 U.S. 847, 94 S.Ct. 133, 38 L.Ed.2d 95. Second, time spent in preparation is only one of many factors to be considered in determining such claims. *Herring v. Estelle*, 5 Cir., 1974, 491 F.2d 125, 127; *Doughty v. Beto*, 5 Cir., 1968, 396 F.2d 128, 130; *Loftis v. Estelle*, 5 Cir., 1975, 515 F.2d 872, 875; *Summers v. United States*, 5 Cir., 1976, 538 F.2d 1208, 1210 n.3; *Jones v. Henderson*, 5 Cir., 1977, 549 F.2d 995, 997. The appropriate test to be applied is whether counsel was reasonably likely to render and did render reasonably effective counsel.[18] *E. g., Herring v. Estelle, supra*; *Hudson v. State of Alabama*, 5 Cir., 1974, 493 F.2d 171, 173.

A review of Fifth Circuit law indicates that this Court's methodology involves an inquiry into the actual performance of counsel in conducting the defense and a determination whether reasonably effective assistance was rendered based on the totality of the circumstances and the entire record. This Circuit does not blindly accept speculative and inconcrete claims of "what might have been if." If an appellant can point to specific examples of ineffectiveness, we have not hesitated to grant a new trial or hearing. See, as examples of this methodology, *United States v. Edwards*, 5 Cir., 1974, 488 F.2d 1154, 1163; *Doughty v. Beto, supra*; *United States v. Frugé*, 5 Cir., 1974, 495 F.2d 557; *Hora v. State of Louisiana*, 5 Cir., 1974, 495 F.2d 1248; *Lee v. Hopper*, 5 Cir., 1974, 499 F.2d 456, 462-65, *cert. denied*, 419 U.S. 1053, 95 S.Ct. 633, 42 L.Ed.2d 650; *Fitzgerald v. Estelle*, 5 Cir.,

1975, 505 F.2d 1334, 1338-42 (en banc), *cert. denied*, 422 U.S. 1011, 95 S.Ct. 2636, 45 L.Ed.2d 675; *Loftis v. Estelle*, 5 Cir., 1975, 515 F.2d 872, 875-76; *Howard v. Henderson*, 5 Cir., 1975, 519 F.2d 1176, 1178, *cert. denied*, 423 U.S. 1036, 96 S.Ct. 573, 46 L.Ed.2d 412; *Jerkins v. United States*, 5 Cir., 1976, 530 F.2d 1203, 1204 n.1; *Mason v. Balcom*, 5 Cir., 1976, 531 F.2d 717, 723-25; *United States v. Fessel*, 5 Cir., 1976, 531 F.2d 1275, 1278-79; *Trahan v. Estelle*, 5 Cir., 1977, 544 F.2d 1305, 1316-20 (Goldberg, J., specially concurring); *Haggard v. State of Alabama*, 5 Cir., 1977, 550 F.2d 1019, 1022-23.

■ Appellant enumerates the following "areas of specific prejudice" suffered as a result of ineffective assistance of counsel (Reply brief at 5-6):

"a) the inadequacy of the opening statement". We have reviewed that statement and conclude that it was reasonably effective.

"b) the inability to confer the first week". First, there was no impediment to Bales and Sakowitz conferring with Gray. Second, as previously noted, Sisson conferred with Sakowitz sometime on Tuesday. Third, court adjourned early on Thursday without one witness taking the stand and did not reconvene until Monday. Fourth, we reiterate the purely perfunctory nature of the evidence put before the jury during the first week.[19]

"c) the failure to subpoena certain witnesses the first week". We find this contention to be frivolous. The witnesses are not named, the materiality of their testimony is not set forth, and at any rate, there was more than ample time to line up any witnesses the defense was seriously interested in calling. We discuss this contention in a different context below.

"d) the decision to allow a young, inexperienced, unprepared attorney to assume the total responsibility for a portion of the ex-

---

18. This issue presents a mixed question of law and fact. *E. g., Lee v. Hopper*, 5 Cir., 1974, 499 F.2d 456, 462, *cert. denied*, 419 U.S. 1053, 95 S.Ct. 633, 42 L.Ed.2d 650.

19. See text accompanying notes 6-13, *supra*.

clusive representation of the defendant". We shall deal with this "prejudice" in detail shortly.

"e) the critical trial decision to put the defendant on the stand". We are wholly at a loss as to how counsel was ineffective in this respect. Not only was there a full year in which to make this decision, but Gray did not take the stand until Wednesday, December 22, the third day of Sisson's return.

"f) the negligence in not objecting to and creating an evidentiary record on the admissibility of the F.B.I. undercover agent's testimony of the defendant's confessional statements". As discussed in detail below, the *Miranda* contention is totally lacking in merit and Sisson's failure to raise the issue in no way supports an ineffective assistance claim.

"g) the inadequate cross-examination by the young associate of the first week's witnesses". This alleged "prejudice" is dealt with below along with item (d).

"h) the necessity of having to give a closing argument while ill and not having the benefit of being present when some of the testimony was entered". We have reviewed the closing argument and have concluded that it was more than reasonably effective. What Sisson missed in the way of evidence during the first week can be summarized in one sentence: "The public figures did not 'know' Gray or Peel." Sisson's performance upon his return is treated more fully *infra*.

"i) the necessity of special jury requests and exceptions to charge". This contention is frivolous as the issues presented on this appeal conclusively demonstrate. No error is asserted as to jury instructions and, as appellant is undoubtedly aware, this Court has not hesitated to reverse convictions when plainly erroneous instructions have been given. *E. g., United States v. Smith*, 5 Cir., 1974, 502 F.2d 1250, 1256.

Thus, appellant has not, either in his briefs or during oral argument, pointed to a single instance which would demonstrate inadequate assistance of counsel, and we have searched the record in vain for one. During the first week of trial, the only evidence presented to the jury was the testimony of the telephone company supervisor, the phone records she verified, and the testimony of the public officials. This aspect of the case was handled by Bales.

As previously noted,[20] Bales was far from a novice in criminal matters and we agree with the District Court's observation on the second day of trial that Bales' ability to pick up the sequence was impressive. Tr. 133. His cross-examination of the public officials, in view of their direct testimony, was thorough.[21] No showing whatsoever has been made that Bales failed to extract any evidence that would have been helpful to Gray.

At the January 31, 1977 hearing, Sisson stated that he should not have allowed Bales to cross-examine the senators and the congressman. Tr. 36. However, he did not go on to say *why* he should not have done so, and he was not asked, "Why?" by new counsel for Gray. As detailed above, with the single exception of Senator Brock, the public officials categorically denied knowing Peel-Justin or Gray, and Senator Brock certainly did not know Gray in the manner intimated to Ponsoldt. While we do not place the emphasis on Sisson's offer to stipulate to their testimony [22] that the government does, in the absence of any indication that their cross-examination failed to elicit testimony that would have been helpful to Gray, we are of the opinion that Bales' performance easily passes Sixth Amendment muster.

**20.** See note 15, *supra*.

**21.** See, for example, text at notes 9 & 11, *supra*.

**22.** The record indicates that Sisson opposed the government's motion to depose the public officials and refused to stipulate to their testimony because of a belief—expressed in open court before Bales—that Peel in fact knew some of them. Tr. 21, 49. As pointed out above, this belief was apparently unfounded.

As to the second week of trial, our review of the record satisfies us that Sisson actually rendered effective assistance. He made standard objections to the tapes evidence, Tr. 205–07; he put the government to its proof to establish the defendant's participation in the conspiracy independent of the hearsay on the tapes, Tr. 211. Sisson moved for Jencks material. Tr. 228. He conducted a vigorous cross-examination regarding the chain of custody of the tapes. E. g., Tr. 241. Sisson successfully kept from the jury transcripts of the taped telephone conversations which allegedly contained inaccuracies. Tr. 309. His objections caused the government to withdraw its motion to introduce the transcript of the Gray-Peisner tape. Tr. 391. He conducted a vigorous cross-examination of Agent Peisner. Tr. 364–82. Sisson twice moved for a mistrial based on a juror's remarks to the marshal passed along to government counsel, and two sets of remarks made by government counsel in the jury's presence. These motions, while ultimately denied, were seriously considered by the District Court who took steps to correct any possible prejudice. Tr. 399–414; 432–44. Motions for judgment of acquittal and to dismiss the indictment were energetically pressed. Tr. 424–32. Sisson's handling of Gray's testimony and his closing argument indicate that he was an accomplished advocate. While of course we are in no position to speculate as to how he would have performed had he felt "100%", we are convinced that the assistance he provided easily satisfies Sixth Amendment standards.[23]

The only suggestion of any inadequacy made during the January 31, 1977 hearing came from Gray who pointed to the failure to call the FBI lab man and two other defense witnesses.[24] These complaints had nothing whatever to do with Sisson's illness; they were plainly matters that should have been handled prior to trial. Moreover, we find Gray's assertion in this respect to be anomalous. On the one hand he argues that it was Sisson's pretrial preparation which made his presence at trial indispensable. Yet the only specifics Gray points to are the kinds of things that Sisson worked on, or should have worked on, during the year between dismissal of the first complaint and the indictment. See Sisson's testimony at the January 31 hearing with regard to his extensive pretrial preparation, Tr. 13–19.

 It is clear that the District Court did not abuse its discretion in denying the continuance motion. The Court was faced with various scheduling problems involving commitments to try other cases. The Trial Judge was also confronted with the unique situation posed by the scheduled appearance of dignitaries who, as a practical matter, could most conveniently be assembled while Congress was recessed.[25]

The District Court went out of its way to be helpful and to accommodate the defense during the first week of trial. Judge King's very practical approach, appointing Sakowitz and awaiting development of events on a day-by-day basis, simply does not amount to an abuse of discretion. Moreover, we agree with the District Court that when all is said and done, this is not the complicated evidentiary case the defense would have us believe. Once a proper predicate was laid for the tapes and once Agent Peisner took the stand, what could

---

**23.** It should also be noted that public defender Sakowitz continued to assist the defense during the first two days of the second week and part of the third day. Tr. 562. He, too, proved to be an effective advocate. E. g., Tr. 281–83; 290–306; 323; 386, 415–22.

**24.** See notes 16–17, supra and accompanying text.

**25.** Senators and congressmen do not enjoy civil process immunity or immunity from testifying in criminal cases, Gravel v. United States, 1972, 408 U.S. 606, 614–15, 92 S.Ct. 2614, 33 L.Ed.2d 583; United States v. Cooper, 1800, 4 U.S. (Dall) 341, 1 L.Ed. 859 (Chase, J., sitting on Circuit). However, when several senators and a congressman are needed to testify at the same trial, as a matter of their convenience, the public good and ensuring their attendance, it

any lawyer have done that was not done here?[26]

### The *Miranda* Claim

■ Gray next contends that the admission into evidence of his statements, made to FBI Agent Peisner on August 13, 1975 without receiving *Miranda* warnings, requires reversal.[27] His argument proceeds as follows. Prior to the conversation, there was probable cause to arrest him. He was clearly the focus of the investigation. The arrest was made immediately after the fifteen-minute conversation ended. The FBI thought the defendant was guilty prior to the conversation and the agency used deceit and subterfuge in order to gain incriminating admissions. Gray's brief concludes, "Evidence seized, be it testimonial or documentary, fraudulently, in violation of a Fourth and Fifth Amendment right should be excluded at the trial in order to sanction the validity of the constitutional guarantees." Main brief 29.

This contention is totally lacking in merit. There is not the slightest shred of evidence that Gray was posing under compulsion or being coerced by Peisner who was acting as Ponsoldt. He may, as he testified at the trial, have doubted that he was conversing with Ponsoldt, and he may have been "afraid."[28] But there is no indication that his statements were not made voluntarily.[29]

■ In *United States v. Hoffa*, 1966, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374, the defendant asserted that the admission into evidence of incriminating statements which he made to Partin, a paid government informer, violated the Fourth, Fifth and Sixth Amendments.[30] The Court rejected each of these contentions, and in doing so, squarely answered Gray's arguments here:

> Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. Indeed, the Court unanimously rejected that very contention less than four years ago in *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462.

\* \* \* \* \* \*

only makes good sense to set the trial date when Congress is not in session.

26. This is simply not a case such as, for example, *United States v. Fessel*, 5 Cir., 1976, 531 F.2d 1275, where a critical defensive move was not made by counsel, or *United States v. Mardian*, 1976, 178 U.S.App.D.C. 207, 546 F.2d 973, where lead defense counsel became ill during the complex Watergate conspiracy trial and there was less than overwhelming evidence to connect Mardian to the conspiracy.

27. The *Miranda* claim was not raised at trial and thus the plain error standard applies. *E. g., United States v. Brown*, 5 Cir., 1977, 547 F.2d 1264, 1266. However, as it pertains to adequacy of counsel we treat it as though raised.

28. If anything, the record indicates Gray's fear that he was talking to a member of the Mafia, not to a police officer. See Tr. 553.

29. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.
*Miranda v. Arizona*, 1966, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694.

30. Gray—very wisely we believe—does not expressly raise a Sixth Amendment claim. A person is not entitled to the presence of counsel while he is committing a crime. *United States v. Anderson*, 5 Cir., 1975, 523 F.2d 1192, 1196 (dictum); *United States v. Baker*, 6 Cir., 1967, 373 F.2d 28, 30; *United States v. Haynes*, 2 Cir., 1967, 398 F.2d 980, 987–88.
Gray contends, however, that all the acts listed in the substantive counts were completed at the time of the conversation. Reply brief at 7. We disagree. During cross-examination, Gray admitted telling Agent Peisner that (i) he was going to Honduras to meet with a federal appeals judge who would be handling Ponsoldt's case, and (ii) Justin was not in Miami because he was running an errand for Senator Eastland (R. at 579). These misrepresentations comprised overt acts in furtherance of the conspiracy and were part and parcel of the scheme to defraud Ponsoldt. They were not statements as to what had occurred previously. These misrepresentations were a part of a crime then and there being committed. Under these circumstances, *Miranda* warnings, either for Fifth or Sixth Amendment purposes, are not required.

## II.

The petitioner argues that his right under the Fifth Amendment not to "be compelled in any criminal case to be a witness against himself" was violated by the admission of Partin's testimony. The claim is without merit.

There have been sharply differing views within the Court as to the ultimate reach of the Fifth Amendment right against compulsory self-incrimination. Some of those differences were aired last Term in *Miranda v. Arizona,* 384 U.S. 436, 499, 504, 526, 86 S.Ct. 1602, 16 L.Ed.2d 694. But since at least as long ago as 1807, when Chief Justice Marshall first gave attention to the matter in the trial of Aaron Burr, all have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion. Thus, in the *Miranda* case, dealing with the Fifth Amendment's impact upon police interrogation of persons in custody, the Court predicated its decision upon the conclusion "that without proper safeguards the process of incustody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. . . ." 384 U.S., at 467, 86 S.Ct. 1602.

In the present case no claim has been or could be made that the petitioner's incriminating statements were the product of any sort of coercion, legal or factual. The petitioner's conversations with Partin and in Partin's presence were wholly voluntary. For that reason, if for no other, it is clear that no right protected by the Fifth Amendment privilege against compulsory self-incrimination was violated in this case.

\* \* \* \* \* \*

## B.

The petitioner's second argument under the Sixth Amendment . . . goes as follows: Not later than October 25, 1962, the Government had sufficient ground for taking the petitioner into custody and charging him with endeavors to tamper with the Test Fleet jury. Had the Government done so, it could not have continued to question the petitioner without observance of his Sixth Amendment right to counsel. *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. Therefore, the argument concludes, evidence of statements made by the petitioner subsequent to October 25 was inadmissible, because the Government acquired that evidence only by flouting the petitioner's Sixth Amendment right to counsel.

Nothing in *Massiah,* in *Escobedo,* or in any other case that has come to our attention, even remotely suggests this novel and paradoxical constitutional doctrine, and we decline to adopt it now. There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

385 U.S. at 302–10, 87 S.Ct. at 413–17 (footnotes deleted).

For a case similar to ours, see *United States v. Ball,* 6 Cir., 1970, 428 F.2d 26, 31, *cert. denied,* 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33, where the Court stated:

[T]he incomplete and continuing nature of the conspiracy was ample reason for Agent Riddle to refrain from arresting Appellant Ridings early in the conversation which would foreclose the development of further evidence of the crimes ultimately charged.

The District Court did not commit error—plain or otherwise—in not excluding Gray's statements to Agent Peisner.

## Pre-Indictment Delay

Gray claims that he suffered actual prejudice when his co-conspirator, Peel-Justin, who allegedly made statements to third parties which would have tended to exonerate Gray, died during the interval between the dismissal of the first complaint and the indictment. This delay, it is claimed, violated Gray's due process rights [31] and warranted dismissal of the indictment. We disagree.

We believe that under the standards announced in *United States v. Lovasco*, 1977, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752, the District Court properly refused to dismiss the indictment.

*Lovasco* is strikingly similar to the case before us. Two possible defense witnesses had died during the eighteen-month period between the offense and the indictment. The Supreme Court held that proof of prejudice is generally a necessary but not sufficient element of a due process claim. The due process inquiry must consider the reasons for the delay as well as the prejudice to the accused. The Court pointed out that prosecutors cannot reasonably bring indictments until they have probable cause to believe the accused is guilty. Moreover, they have no duty to file charges until satisfied that the "beyond a reasonable

doubt" standard can be met. The imposition of a duty to bring charges prematurely would adversely affect the rights of the accused and the ability of society to protect itself. See 431 U.S. at 788–796, 97 S.Ct. at 2048–2052, 52 L.Ed.2d at 759–63.

The record clearly shows that the government's investigation continued during this year.[32] In view of this fact and the highly speculative nature of the prejudice asserted by Gray,[33] the *Lovasco* holding is dispositive of this claim:

> [T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

*Id.* at 783, 97 S.Ct. at 2045, 52 L.Ed.2d at 763.

## Nine Years

Appellant complains that the trial court was guilty of an abuse of discretion in meting out a nine-year sentence. He points to the fact that he had no previous criminal record and to the Trial Judge's over-emphasis on the deterrent effect to be accomplished by the sentence. Gray argues that the sentence was imposed in vengeance.[34] Main brief at 37; reply brief at 10.

---

**31.** Gray's claim is bottomed solely on the due process clause. No Speedy Trial Act violation is raised on this appeal. Appellant's main brief at 31.

**32.** During the January 31, 1977 hearing on Gray's motion for a new trial based on the ineffective assistance of counsel claim, Mr. Sisson responded to a question as follows:

> After the matter was dropped by the authorities in 1975, I was aware that they were still calling witnesses in the case.

January 31, 1977 hearing, Tr. 13. See also Tr. 425.

**33.** Sisson conceded before the Court that there was no guarantee that Peel would take the stand to exonerate Gray. Tr. 427. See also note 5, *supra*. Moreover, it must be borne in mind that a sizable portion of the damning evidence came out of Gray's own mouth.

**34.** Before sentencing Gray, the Court stated:

> As Mr. Kuhn has stated, and one might expect a person who is a professional person and who has become a lawyer, the defend-

ant's background is clear of any prior criminal involvement of any sort.

> And I do agree with Mr. Kuhn that there is very little likelihood that this defendant would ever find himself engaged in any criminal activity whatsoever in the future.

> But there is the very serious obligation upon the Court to establish a deterrent to others, or they might be persuaded that conduct of this type is treated lightly or condoned.

> So, in a very difficult and in a very serious manner and vein, this Court now is prepared to go forward with the sentencing in this case, with the comment that the sentence that is about to be imposed is imposed with the primary factor and consideration in mind that it is a deterrent, or will be deterrents to others.

> I normally do not have a great deal to say at the time of sentencing, but I think that this particular offense. warrants some comment about this Court's personal view and philosophy of sentencing and of this particular offense.

A Federal District Judge has wide discretion in determining what sentence to impose. If within statutory limits, the sentence is generally not subject to review, *United States v. Tucker*, 1972, 404 U.S. 443, 446–47, 92 S.Ct. 589, 30 L.Ed.2d 592; *United States v. White*, 5 Cir., 1975, 524 F.2d 1249, 1254, *cert. denied*, 1976, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375; *United States v. Vice*, 5 Cir., 1977, 562 F.2d 1004, and will not be disturbed on appeal in the absence of a clear abuse of discretion, *United States v. Moore*, 5 Cir., 1970, 427 F.2d 38, 42, *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384. We find no abuse of discretion. Judge Coleman's remarks in *White, supra*, bear repeating here:

> . . . Appellant has the opportunity under Rule 35 of the Rules of Criminal Procedure to move for reduction of sentence within 120 days after the receipt of our mandate. The attention of counsel is specifically directed to this fact.

AFFIRMED.

There is very little that a lawyer can do in his professional life that is more degrading or contemptible than what Billy Gray stands convicted of doing in this case.

By stating to persons that one has influence to effect the outcome of a Federal criminal trial or any criminal trial or to effect the outcome of any suit or cause or case or controversy pending in court, does two things:

First, it destroys or tends to destroy the reputations of the persons involved that the defendant alleges to have the influence he is attempting to sell for profit;

Second, it tends to destroy and does destroy, ultimately, the confidence of the public in their judicial system and in their elected officials.

Mr. Gray stands convicted of attempting to steal the good name and reputation of each of the senators, the representatives, the judge involved, indirectly, and the other lawyers and individuals with whom he stated to others or alleged to others that he could influence or that he could get to influence the outcome of a criminal trial pending in this district.

This type of conduct can destroy in a few days what it takes a man or a woman in public life years to build up.

In my personal view and philosophy, this is a far greater crime than stealing the possessions of or the property of another and it is one of the most despicable and serious crimes that a person can commit.

March 3, 1977 hearing, Tr. 12–14.