Ernest DANIELS, Plaintiff-Appellant,

v.

Ross MAGGIO, Jr., Warden, Angola Penitentiary, and The Attorney General of the State of Louisiana, Defendants-Appellees.

No. 81–3024.

United States Court of Appeals, Fifth Circuit.

March 12, 1982.

Bruce C. Waltzer, New Orleans, La., for plaintiff-appellant.

John H. Craft, Asst. Dist. Atty., New Orleans, La., for defendants-appellees.

Before POLITZ and RANDALL, Circuit Judges, and PARKER *, District Judge.

JOHN V. PARKER, District Judge:

Appellant, Ernest Daniels, was convicted in Louisiana state court in New Orleans of armed robbery in violation of LSA–R.S. 14:64 and, after a hearing in accordance with state law, was sentenced as a multiple offender to an enhanced sentence of 99 years without benefit of probation or parole. He appeals from the denial by the district court of his petition for habeas corpus. For reasons detailed below, we conclude that the district court was correct and that Daniels is not entitled to relief.

Daniels has exhausted state remedies: His conviction and sentence were affirmed by the Louisiana Supreme Court, *State v. Daniels*, 346 So.2d 672 (La.1977) and he then sought habeas corpus relief in state court. After an evidentiary hearing, the state trial court denied relief and the Supreme Court of Louisiana denied review. *State ex rel. Daniels v. Blackburn*, 377 So.2d 1034 (La. 1979). Daniels then initiated his petition for habeas corpus under 28 U.S.C. § 2254.

The collateral attack upon the conviction relates to the trial performance of Daniels' court-appointed counsel and includes an attack upon a rule of the Supreme Court of

---

* Chief Judge of the Middle District of Louisiana, sitting by designation.

Louisiana which allows participation by law students in criminal trials, under some circumstances.

## FACTS

On August 15, 1974, two armed black males forced their way into a loan company office in New Orleans and robbed the employees. In January, 1975, Daniels and co-defendant, Edward Watson, were arrested, apparently as the result of a tip from an informant. Both were charged with armed robbery. Shortly thereafter, attorney Basile Uddo, an experienced criminal practitioner, was appointed by the court to represent Daniels. Daniels also consented that two senior law students from the Tulane Law School assist Uddo. On February 24, 1975, Uddo and the law students filed motions on behalf of Daniels, including a motion for a bill of particulars, a motion for oyer of any confession and a motion to suppress the testimony of line-up identification of Daniels. The motions were heard on March 4, 1975, and there was an evidentiary hearing on the motion to suppress. The record shows that examination of the witnesses at the trial of the motion to suppress was conducted completely by the law students under Uddo's supervision. The motion was denied by the court. On that same date, the court granted a motion that a subpoena issue for the trial testimony of a Dr. McDaniel. Additional motions were heard on March 21, 1975, again presented by the law students under Uddo's supervision. On April 3, 1975, trial of Daniels and Watson began with Uddo and the law students representing Daniels. Co-defendant Watson was represented by retained counsel. For reasons which are not entirely clear from the record before us, a mistrial was declared prior to completion of the selection of the jury. The matter was reassigned for trial on May 8, 1975. On May 2, 1975, the prosecution filed a motion to offer evidence of other crimes committed by Daniels for the purpose of showing "system and intent." The motion was opposed by the law students, under Uddo's supervision, and on May 7th, the court denied the prosecution's motion. Trial began on May 8th.

One or two days prior to trial, Uddo discovered that he could not be present for trial and he requested Mr. Frederick W. Bradley to take over the defense of Daniels. Mr. Bradley agreed and Daniels consented to this arrangement; the court thereafter approved the substitution. At the trial the jury convicted Daniels and acquitted the co-defendant, Watson.

Daniels contends that Bradley, although a "top flight oil and gas lawyer" had tried only one criminal case before the *Daniels* case and that he and the two law students committed many trial errors which resulted in denial of his Sixth Amendment right to effective assistance of counsel.

## STANDARD OF REVIEW

The standard applicable to review of claims of ineffective assistance of counsel is well established. A habeas corpus petitioner has the burden to demonstrate by sufficient factual proof, an identifiable lapse on the part of trial counsel, as well as some actual adverse impact upon the fairness of his trial which results from that lapse. *Boyd v. Estelle*, 661 F.2d 388 (5th Cir. 1981); *Washington v. Watkins*, 655 F.2d 1346 (5th Cir. 1981). While it is clear that the Sixth Amendment, made applicable to the states through the Fourteenth Amendment, prevents the state from conducting trials at which defendants must defend themselves without adequate legal assistance, *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the constitutional standard is "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance." *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960) adopted on rehearing, en banc 289 F.2d 928 (5th Cir.) *cert. den.* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). The determination of whether the defendant received reasonably effective assistance of counsel is predicated upon the entire record and the totality of the circumstances surrounding the trial performance. *Washington v. Estelle*, 648 F.2d 276 (5th Cir. 1981).

■ Here Daniels was granted an evidentiary hearing in state court upon his claims of ineffective assistance of counsel and under 28 U.S.C. § 2254(d), the federal district court was required to give a presumption of correctness to state court findings of fact. *Grantling v. Balkcom*, 632 F.2d 1261, 1263 (5th Cir. 1980). The record here shows that the state court made no specific findings of fact; it simply generally concluded that counsel for Daniels was not incompetent. This conclusion does not constitute a specific factual finding to which the § 2254(d) presumption attaches. *Mason v. Balcom*, 531 F.2d 717, 722 (5th Cir. 1976). Accordingly, the district court was free to draw its own factual conclusions from the state court habeas corpus hearing or to conduct its own evidentiary hearing. No evidentiary hearing was held in the district court and our review is of the state court proceedings.

In his brief, Daniels focuses upon Bradley's minimal criminal trial experience, the late substitution of counsel and the inexperience of the law students who actually conducted all examination and cross examination of witnesses. He fails to clearly articulate identifiable lapses by counsel and actual adverse impact upon the fairness of his trial as is required by the jurisprudence. *Boyd v. Estelle*, 661 F.2d 388 (5th Cir. 1981); *Washington v. Watkins*, 655 F.2d 1346 (5th Cir. 1981). At oral argument, however, counsel settled upon the following as constituting trial errors impinging upon the fairness of his trial: (1) The failure to require the live testimony of a physician who was a "crucial" defense witness; (2) The alleged "bungling" of the examination of a defense witness who, invoking his privilege under the Fifth Amendment, refused to answer any questions; (3) The failure to adequately and effectively cross examine prosecution witnesses, particularly as to impeachment by prior inconsistent statements; and (4) The failure to timely object to the jury selection procedure, thus not preserving that issue for appellate review.

**(1) The Absence of the Medical Witness.**

■ About two months prior to the date of the robbery, August 15, 1974, Daniels sustained gunshot wounds in his lower right leg, his left hip, his left buttock and his right arm. As a result of those wounds, he was treated at Charity Hospital in New Orleans by a Dr. James G. McDaniel. Surgery was performed and Daniels was placed in a cast covering his shattered right fibula. He was hospitalized from June 16th through June 25th, 1974 and was discharged to one month's bed rest with a long-leg cast on his right leg. On July 23, 1974, the cast was removed from the leg and at that time Daniels still walked with a limp.

One of the robbery victims initially told investigating police officers that one of the robbers had jumped over a counter during the course of the robbery and Daniels was identified as that person. In anticipation of such testimony at the trial, Uddo and the law students under his supervision attempted to establish what they termed a "medical alibi" which was designed to convince the jury that on the date of the robbery, it would have been "medically impossible" for Daniels to have jumped over the counter. To that end, the defense sought witnesses among Daniels' relatives and friends who had seen him during the weeks immediately preceding the date of the robbery and also sought the Charity Hospital physician who had treated him. They were able to locate the physician, Dr. McDaniel, and, as noted earlier, secured an order of court directing the issuance of a subpoena to him. Miss Nancie Theissen, one of the law students representing Daniels, testified at the state habeas corpus hearing, that when they interviewed Dr. McDaniel, "he could not say that Daniels could not possibly have jumped over the counter because of the gunshot wounds."

Miss Theissen further testified that, subsequent to the interview, and as a matter of trial strategy, they decided that the most effective way to present the medical testimony was to offer the hospital records and an affidavit from Dr. McDaniel under a stipulation with the prosecution that if Dr. McDaniel were called as a witness, he would testify according to the affidavit.

An affidavit, notarized by Uddo, was secured, in which Dr. McDaniel describes in detail the wounds, the surgical procedures performed upon Daniels, the hospitalization and post-hospitalization care of Daniels and concludes by stating:

"On July 9th, the patient [Daniels] returned for an examination. X-rays were taken and multiple metallic fragments were found to be present in his left hip joint. No hip fracture was noted. His lower leg cast was modified to a walking cast. Mr. Daniels returned to the clinic once again on July 23rd, 1974 at which time the cast on his right leg was removed. At that time, Mr. Daniels still had a limp. He was scheduled for x-rays and an examination on August 20th, 1974."

At trial, the witness who had previously informed the police that Daniels had jumped over the counter during the course of the robbery, denied having made that statement. Nevertheless, counsel (one of the law students) was able to impeach the witness through the cross examination of a police officer who positively testified that the witness had informed investigating officers that Daniels had jumped over the counter during the course of the robbery.

The physician's affidavit and the Charity Hospital records were offered and received in evidence at trial. In addition, Daniels called his mother, his sister and a neighbor, all of whom testified that he had been shot in the leg a month or so before the robbery, that his leg had been in a cast and that he walked with a limp for a period of time after the cast was removed. None could precisely remember Daniels' physical condition or his whereabouts on the date of the robbery or even where they were themselves on the date of the robbery.[1]

Daniels implies that his counsel did not know how to secure the attendance of Dr. McDaniel for trial and that the absence of this witness demonstrates the incompetence of counsel. As we have noted, however, the record shows to the contrary; counsel secured a court-ordered subpoena for the attendance of the physician but made a deliberate trial decision to present his affidavit, rather than in-person testimony. That decision was based upon an interview with the witness at which it developed that Dr. McDaniel could not definitely support the defense theory. The affidavit presented the medical facts regarding appellant's condition at the time of the robbery in the most favorable light possible, given Dr. McDaniel's uncertain opinion and, it prevented cross examination of the physician, thus eliminating the possibility of any unfavorable surprise admission.

■ Assuming, however, that there was error in counsel's strategy to substitute Dr. McDaniel's affidavit for his testimony, Daniels has not shown that this decision resulted in any degree of prejudice to his case, particularly since McDaniel "could not say that Daniels could not possibly have jumped over the counter." The habeas corpus petitioner bears the burden of establishing not only error but prejudice. *Beavers v. Balkcom*, 636 F.2d 114 (5th Cir. 1981); *Lovett v. Florida*, 627 F.2d 706 (5th Cir. 1980). Moreover, a conscious and informed decision on trial tactics cannot be the basis for constitutionally ineffective representation unless it is so ill chosen that it permeates the entire trial with obvious unfairness. *Fitzgerald v. Estelle*, 505 F.2d 1334 (5th Cir. 1975). The trial strategy here appears to have been the best choice, but in any event, appellant has not shown prejudice in any degree.

---

1. The issue at trial was, of course, identification of the robbers; there was no argument that the robbery had, in fact, occurred. Some witnesses could not identify either defendant. Daniels was, however, identified positively by two witnesses, while only one witness positively identified the co-defendant, Watson. There was no fingerprint or other circumstantial evidence offered by the prosecution. At trial, Watson called his mother, his girlfriend, his sister and his sister's boyfriend, all of whom testified that they clearly and accurately remembered August 15, 1974 (the date of the robbery) because it was the sister's boyfriend's birthday and a surprise party which they had planned for him was spoiled when Watson and his girlfriend quarreled. All placed Watson at a location far removed from the scene of the robbery at the time of the robbery. Watson was acquitted.

(2) The Bungling of Simpson's Testimony.

At trial, Daniels called Tyrone Simpson as a defense witness, who, when asked whether he knew Daniels, replied, "I refuse to answer that question under [sic] the grounds that it might incriminate me;" to which the law student conducting the examination responded, "No further questions."

Daniels now urges that his counsel was incompetent in failing to insist upon further examination of Simpson out of the presence of the jury regarding the basis for his plea of the privilege against self-incrimination. Daniels insists that his counsel had in their possession a handwritten statement signed by Simpson stating that while he was in custody, as a result of police beatings, he falsely gave the police the name of Daniels and Watson as being connected with the robbery which he actually knew nothing about. Daniels insists that neither Bradley nor the law students knew how to demand such a hearing out of the presence of the jury and that they could have forced Simpson to admit that he informed upon Daniels only because of police beatings.

At the habeas corpus hearing, Bradley testified that he thought Simpson's testimony was poorly handled, that Daniels insisted on calling Simpson as a witness although his counsel did not want to do that and that counsel did not know beforehand that Simpson was going to plead the privilege against self-incrimination. Miss Theissen could not distinctly remember whether they had any statements from Simpson or, if they did, whether those statements did include information of the nature described by Daniels. Neither the other law student who participated in the trial, (and who conducted the examination of Simpson) nor Uddo was called to testify at the state habeas corpus hearing.

The record does contain a handwritten statement signed "Tyrone Simpson" (the signature is not in the same handwriting as the statement) reciting that Simpson "under a severe beating and extreme pressures and extensive questioning by the robbery division—police officers, did falsify names and date of arm [sic] robbery that I knew nothing about. My only reason for making statements about Harold Hayes, [who is otherwise unidentified] Edward Watson, Ernest Daniels was to relive [sic] some of the pain. . . ." We assume that this is the statement to which counsel for Daniels refers. Although Miss Theissen's memory was hazy as to the contents of the statement, she did recall that the statement was not offered in the record because, "We had spoken with Mr. Simpson ahead of time and at that time, we had decided not to do that." She could not recall the reason for that tactical trial decision.

Simpson was not a prosecution witness. The only witnesses called by the state were employees of the loan company, two of whom identified Daniels as one of the robbers, both at a pretrial line-up and at trial and investigating police officers. No state witness ever mentioned Simpson or the circumstances which led to the arrest of Daniels and Watson. Simpson was called as a defense witness by Daniels, apparently for the purpose of attacking the identification of Daniels by the two state witnesses.

Daniels insists that counsel should have requested a hearing out of the presence of the jury, secured the order of the court requiring Simpson to testify and placed the handwritten statement before the jury. He further insists that their failure to do so rendered counsel ineffective within the standard of the Sixth Amendment.

We agree that Simpson's appearance was not well handled, but Miss Theissen's testimony indicates that a pretrial tactical decision had been made not to use Simpson's prior handwritten statement. Assuming that to be the case, the reason for calling Simpson at all becomes unclear, since his plea of privilege did not help Daniels' case. Counsel certainly should have been prepared to insist upon traversing Simpson's plea of privilege, if that testimony was important. Tactical decisions do not constitute ineffective assistance of counsel, however, simply because in retrospect it is apparent that counsel chose the wrong course. *Akridge v. Hopper,* 545 F.2d 457 (5th Cir. 1977).

It is not clear from this record why no additional examination of Simpson was conducted; that is to say, it is unclear whether there was a tactical decision to let the plea of privilege simply stand, or whether the law student conducting the examination, faced with the plea of privilege, did not know what to do. Since the law student who conducted the examination did not testify at the habeas corpus hearing and the testimony of Bradley and Miss Theissen is not very revealing, we are left in the dark concerning this development at the trial.

More to the point, however, Daniels has not shown in what specific manner his case was prejudiced by this alleged mix-up. Had Simpson actually testified that he had lied to the police about the involvement of Daniels and Watson because the police beat him, counsel may have had an additional argument to the jury, but the testimony would not necessarily negate the identification of Daniels which was made by the prosecution witnesses. The testimony of Bradley at the habeas corpus hearing also indicates that Simpson had a criminal record and that he became acquainted with Daniels in prison, information which would have been highly prejudicial to Daniels had it come out. It is quite possible that counsel concluded that it was wiser to let well enough alone, to let Simpson go, before he said something that would actively hurt the client's case. Bradley testified that Simpson was called only upon the insistence of Daniels and against the advice of counsel. Our review of this trial record convinces us that, on balance, it would probably have been better not to call Simpson at all, but that his brief appearance on the witness stand resulted on no discernible prejudice to Daniels. Neither did counsel's failure to pursue the basis for his plea of privilege.

(3) Inadequate Cross Examination of Prosecution Witnesses.

■ Daniels argues that Bradley, his substitute attorney, should not have permitted the law students to conduct the examination of all witnesses and further argues that the record shows that in several instances the law students did not know how to properly cross examine, particularly as to impeachment by prior inconsistent statements. Apparently a transcript of the preliminary hearing was available at the trial and Daniels insists that the law students did not properly use prior inconsistent statements made by some prosecution witnesses at that preliminary hearing.[2]

Daniels complains that Miss Theissen failed to adequately cross examine and impeach the prosecution's first witness, Norma Perez. That witness could not identify anyone as a participant in the robbery, although she was an employee present in the office at the time. Her testimony simply helped establish the fact of the robbery by two armed black males, which was undisputed by the defense. She did not link Daniels or Watson to the crime. Where a witness has not hurt your client, cross examination is normally not undertaken. Miss Theissen, nevertheless, cross examined Perez and made the witness admit that she had lied to the law students during a pretrial interview. (The witness said to the law students that she was in the back of the office and did not see anything but she testified at trial that she was in the front and did witness the robbery) Her excuse for lying to the law students was that she did not want to answer their questions. Miss Theissen also secured an admission from this witness that the manager of the loan company instructed defense counsel to refrain from interviewing any of his employees.

Miss Theissen's cross examination of this witness was professionally competent in every respect.

Daniels next asserts that the testimony of Marjorie Ellenbush, another loan company

---

**2.** There is no transcript of the preliminary hearing in the record before us, although there is a transcript of the testimony taken at the March 4th, 1975 hearing on the motion to suppress.

That hearing was limited to procedures utilized in photographic and line-up identifications by the witnesses.

employee, was inconsistent with her testimony at the preliminary hearing and that the law student conducting the cross examination "did not know how to use that." Counsel has not directed us to any specific prior inconsistent statement and, as previously noted the transcript of the preliminary hearing is not in the record before us. Our review of the transcript of the testimony given at the motion to suppress does not reveal any significant inconsistencies in the testimony of this witness. Cross examination was not polished and smooth, nor was it error free. However, some admissions favorable to the defense were secured and the cross examination was reasonably effective.

Daniels also claims that the manager of the loan company, Stanley Madere, was not adequately cross examined. This was the witness who had told police that Daniels jumped over the counter during the course of the robbery. On cross examination, he denied having made that statement. The statement was made, however, not as indicated by Daniels, at the preliminary hearing, but in an interview with police officers. The record does show that Miss Theissen failed to pursue the witness's denial of having made the statement. It may be that Miss Theissen was not familiar with the foundation required for impeachment by LSA–R.S. 15:493, but the record does not conclusively demonstrate that. Obviously the statement that Daniels had jumped over the counter was important to Daniels' defense and counsel were required to use every resource at their command to put it before the jury. The record shows that they did so.

When the prosecution called one of the investigating police officers, the defense secured from him affirmative testimony that the manager, Madere, had stated that the robber later identified as Daniels, jumped over the counter during the robbery. While it might have been desirable and more dramatic to confront the witness with his prior statement, there is no indication in the record that the statement by Madere to the police was in writing, or if it was, that the defense had the statement in its possession.

As it turned out, Daniels' counsel secured testimony from a police officer which contradicted the testimony of the only prosecution witness who positively identified both Daniels and Watson. If there was error in the cross examination of Madere, Daniels has not established any prejudice resulting to his case, since the evidence which he desired was in fact presented to the jury and was the predicate for his "medical alibi."

Daniels also insists that Bradley did not adequately and properly supervise the two law students throughout the trial and, because of his own inexperience, he was not able to provide an effective defense.

 A continuing theme in appellant's argument is that the admitted minimal criminal trial experience of court appointed counsel and the assisting law students, without more, justifies reversal of his conviction. The trial judge has a duty to see to it that defense counsel is reasonably competent to conduct the defense and that counsel actually renders effective assistance. Criminal trial experience is one factor to be considered in determining whether counsel is reasonably competent to defend, but it is only one factor. In this case, Daniels has not demonstrated any actual adverse impact upon the fairness of his trial resulting from counsel's lack of criminal trial experience. Appellant has not shown specific omissions by counsel indicating a lack of preparation and degree of skill reasonably required of counsel in a criminal case as in *Kemp v. Leggett*, 635 F.2d 453 (5th Cir. 1981). In *Kemp*, there although counsel lacked criminal trial experience, the defense was held ineffective, not for inexperience, but because counsel made no investigation, failed to call available witnesses, misadvised his client, failed to submit jury charges on a lesser included offense and rejected an offer to plead guilty to a lesser included offense without fully explaining the alternatives to his client. In determining the constitutional standard for effectiveness of defense counsel, we look to the totality of the actual trial performance, not merely at length of experience.

Appellant admits that Bradley was a "top flight oil and gas lawyer." The record establishes that he and Uddo were associates in the same New Orleans law firm and that both were participating as supervising lawyers in the Tulane Law Clinic. Uddo had more experience in criminal practice; Bradley's prior criminal experience was limited to one robbery case which he had previously tried. The record establishes, however, that Bradley had had prior courtroom experience in civil cases. He and Uddo were close friends and exchanged information about their cases and, Bradley testified that he was generally familiar with the *Daniels'* case long before Uddo asked him to take over the representation. Although he had not worked on the case, the record shows that he was in court on a motion of his own at a time when some of the motions in *Daniels'* case were presented to the court. He had, apparently, previously met the two law students who were working with Uddo. He was not a complete stranger to the case who appeared at the eleventh hour.

The record also establishes that the two law students involved, Nancie Theissen and J. Spencer Dreischarf, worked on this case ten to twenty hours per week; they stayed in regular communication with Daniels; they reviewed every step with Uddo, who signed every pleading and appeared in court on every occasion except the actual trial (when Bradley appeared for him). They attempted to interview every prosecution witness, although some refused to be interviewed and, as the record shows, some lied during the interviews. The law students attempted to locate witnesses for the defense. They interviewed Daniels' mother and other relatives as well as his neighbors and the defense called some relatives and one neighbor as witnesses. The record also shows that during the course of this case, the law students, under Uddo's supervision, made some eight or nine pretrial court appearances, including participation in the first trial which resulted in a mistrial. Miss Theissen testified that they reviewed with Uddo evidence and methods of impeaching and cross examining witnesses. She also testified that, prior to trial, she and Mr.

Dreischarf prepared questions on direct and cross examination and that they rehearsed with each other the asking of questions and making of objections. In short, the record shows that, under Uddo's pretrial guidance, these two law students devoted an enormous amount of time, energy and effort to the defense of this case and also establishes that the defense was quite well prepared for trial. Both Bradley and Miss Theissen testified that there were no surprises (with the possible exception of Simpson taking the Fifth Amendment) and that they got into evidence virtually everything that they wanted to present to the jury. While both Bradley and Miss Theissen indicated that they were not fully satisfied with the presentation made, this record establishes that a reasonably effective defense was presented to the jury which tried Daniels.

(4) Failure to Timely Object to Jury Selection Procedures.

Article 784 of the Louisiana Code of Criminal Procedure requires that in selecting a petit jury panel, names shall be drawn from the jury pool or venire indiscriminately and by lot in open court. The record indicates that apparently a custom has arisen in Louisiana procedure in the New Orleans area to ignore that portion of the law, and that names are drawn from the jury pool by the clerk of court and not in open court. After the jury had been selected in the *Daniels'* case, counsel for Watson objected to the selection procedure, pointing out to the court that the procedure established by Article 784 had not been followed. That objection was adopted by Bradley, counsel for Daniels, which was overruled on the ground that it was not timely made. The Supreme Court of Louisiana declined to review the trial court's ruling because the objection was untimely, holding that the error was waived. *State v. Daniels*, 346 So.2d 672, 674 (La.1977).

Daniels argues that this failure to preserve the objection for appellate review establishes the incompetence of his counsel. Clearly, if counsel really wanted to preserve this question for review, it was error to

wait until after the jury was selected to make the objection. Daniels has not, however, demonstrated any prejudice resulting to him by reason of the jury selection procedure. He does not attack the jury venire nor the petit jury panel on racial or other grounds and there is no evidence in this record indicating that this technical failure to comply with Louisiana procedure resulted in any unfairness to Daniels. It is clear that the habeas corpus petitioner must show some degree of prejudice. *Washington v. Watkins*, 655 F.2d 1346 (5th Cir. 1981) and cases therein discussed.

(5) Law Student Participation.

█ Rule XX of the Rules of the Supreme Court of Louisiana permits law students enrolled in a law school sponsored clinical instruction plan to engage in some criminal trial work, under the supervision of a lawyer who "must be personally present throughout the proceedings and shall be fully responsible for the manner in which they are conducted."

Daniels attacks the manner in which this rule was applied in his case, rather than the rule itself. His argument is that application of the rule allowed law students to conduct his entire defense, that they lacked the requisite skills and experience to render effective assistance of counsel and that they did not in fact render effective assistance.

Because we have concluded that Daniels suffered no significant prejudice to his case and that counsel was reasonably effective, it is apparent that we reject also his attack upon this rule.

(6) Conclusion.

While we hold that counsel for appellant met the constitutional standard for effective assistance, this opinion should not be construed as approval of appointment of counsel at the last minute, *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), *Herring v. Estelle*, 491 F.2d 125 (5th Cir. 1974), nor of appointment of counsel lacking the skills necessary to compete with the prosecution, *Kemp v. Leggett*, 635 F.2d 453 (5th Cir. 1981), nor of inadequate prepa-

ration or investigation by defense counsel, *Gaines v. Hopper*, 430 F.Supp. 1173 (M.D. Ga.1977), aff'd 575 F.2d 1147 (1978). Under the particular facts of this case, however, specifically the careful and detailed pretrial investigation and preparation conducted by Uddo and the two law students, and the conduct of the trial itself, counsel did render reasonably effective assistance to Daniels.

AFFIRMED.