Timothy George **BALDWIN**,
Petitioner-Appellant,

v.

Ross **MAGGIO, Jr.,** Warden, Louisiana State Penitentiary, and William J. Guste, Jr., Attorney General of the State of Louisiana, Respondents-Appellees.

No. 82–3318.

United States Court of Appeals,
Fifth Circuit.

May 16, 1983.

Rehearing and Rehearing En Banc
Denied June 23, 1983.

. Gravel, Robertson & Brady, Helen G. Roberts, Alexandria, La., for petitioner-appellant.

Bruce G. Whittaker, Asst. Dist. Atty., Monroe, La., for respondents-appellees.

Before RUBIN and JOHNSON, Circuit Judges, and PARKER,* District Judge.

JOHNSON, Circuit Judge:

Timothy George Baldwin is sentenced to die for the murder of Mary James Peters. A panel of this Court stayed his execution to consider his claims of ineffective assistance of counsel at the guilt and sentencing phases of his trial.[1] The performance of his attorneys in the guilt phase was not consti-

---

* John V. Parker, Chief Judge of the Middle District of Louisiana, sitting by designation.

1. Baldwin presented a third claim in his petition for habeas corpus: he argued that the Louisiana Supreme Court's practice of conducting its proportionality reviews of sentences meted out in capital murder cases on a district-by-district basis fails to satisfy the eighth and fourteenth amendments to the United States Constitution. Baldwin concedes that this panel's consideration of that claim is foreclosed by the *en banc* Court's rejection of an identical claim in *Williams v. Maggio*, 679 F.2d 381,

tutionally deficient; the alleged deficiencies in their investigation into considerations in mitigation of sentence have not been shown to have caused actual, substantial prejudice to the petitioner's defense. Baldwin's request for habeas corpus is denied.

## I.

On the evening of April 4, 1978, eighty-five year old Mary James Peters was savagely beaten and left to die in the kitchen of her home in West Monroe, Louisiana. The instruments of death were the articles of everyday life: a telephone, a television, a kitchen stool and a cast iron skillet, all shattered into pieces by the force of the assault. She was found the next day, semicomatose and incoherent, on the floor surrounded by the debris of the attack; she died on April 6 of massive cerebral hemorrhage and swelling, secondary to external head injuries.

Timothy Baldwin stood trial for her death. The jury convicted him of murder in the first degree,[2] and recommended death on finding that the murder was committed in an especially heinous, atrocious and cruel manner during the perpetration of an armed robbery.[3] He was sentenced to die by electrocution. Baldwin's exhaustive appeal to the Louisiana Supreme Court was rejected, *State v. Baldwin,* 388 So.2d 664 (La.1980), and denied certiorari, *Baldwin v. Louisiana,* 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981). Baldwin then mounted his initial collateral attack on his conviction. Sixteen claims were advanced; among them was an allegation that his trial counsel were ineffective because they failed to move for a new trial after acquiring a motel receipt corroborating Baldwin's alibi testimony.[4] Baldwin's application for post-conviction relief was denied by the state

---

394–95 (5th Cir.) (*en banc*) *petition for cert. pending* (U.S. Dec. 10, 1982) (No. 82–5868).

We note that the Supreme Court has recently granted a petition for certiorari presenting proportionality review issues similar to those raised by Baldwin in his petition for habeas corpus. *Pulley v. Harris,* 692 F.2d 1189 (9th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1425, 75 L.Ed.2d 787 (1983).

2. Baldwin was convicted under La.Rev.Stat. Ann. § 14:30 (West), which provides, in pertinent part,

First degree murder is the killing of human being: (1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery:

. . . . .

Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the recommendation of the jury.

3. Louisiana allows a sentence of death to be imposed if "the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed." La. Code Crim.Pro.Ann. art. 905.3 (West). The recommendation must be unanimous. La.Code Crim.Pro.Ann. art. 905.6 (West).

Aggravating circumstances are defined by La.Code Crim.Pro.Ann. art. 905.4 (West), which provides, in pertinent part, that

The following shall be considered aggravating circumstances:

(a) the offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or simple robbery;

. . . . .

(g) the offense was committed in an especially heinous, atrocious, or cruel manner.

Mitigating circumstances, under La.Code Crim.Pro.Ann. art. 905.5 (West), include

(a) The offender has no significant prior history of criminal activity;

(b) The offense was committed while the offender was under the influence of extreme mental or emotional disturbance;

. . . . .

(e) At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication;

. . . . .

(h) Any other relevant mitigating circumstances.

4. The petition also included an allegation that the Louisiana Supreme Court conducted its proportionality review of Baldwin's death sentence in a constitutionally impermissible manner. *See Baldwin II,* 653 F.2d at 953–54; *ante* n. 1.

trial court for want of jurisdiction. The Louisiana Supreme Court declined review of the state trial court's decision. Proceedings in federal court on his petition for habeas corpus yielded consideration of the merits of his claims; all were, nonetheless, rejected. *Baldwin v. Blackburn,* 524 F.Supp. 332 (W.D.La.), *aff'd* 653 F.2d 942 (5th Cir.1981), *cert. denied,* 456 U.S. 950, 102 S.Ct. 2021, 72 L.Ed.2d 475, *reh. denied* 457 U.S. 1112, 102 S.Ct. 2918, 73 L.Ed.2d 1323 (1982) (hereinafter *Baldwin II* ).

The Louisiana trial court then ordered Baldwin to be electrocuted on May 27, 1982. Ten days before his sentence was to be carried out, Baldwin initiated the present proceedings for post-conviction relief. His petition was denied by the state trial court on the day it was filed, and by the Louisiana Supreme Court the following day. One day later he presented identical claims to the federal district court.[5] The district court denied his petition for habeas corpus relief without a hearing, and declined to stay his execution. Three days before the appointed date of execution this Court granted a stay pending appeal.

## II.

Baldwin asks reconsideration of our earlier ruling that his trial counsel's failure to move for a new trial upon acquisition of an alibi-corroborating motel receipt did not constitute ineffective assistance of counsel, *see Baldwin II,* 653 F.2d at 947.[6] In this presentation of the claim, he argues that the motel receipt, viewed in the context of the entire trial record, conclusively demonstrates that he was seventy miles away from West Monroe at the time Mrs. Peters was fatally beaten. He asks that a writ of habeas corpus issue immediately, on the ground that the record as it is presently constituted indisputably discloses his innocence, and, perforce, inept representation by trial counsel; failing that, he asks for an evidentiary hearing exploring his former attorneys' decision not to move for a new trial. We shall first take up the latter claim.

## A.

■ Whether an evidentiary hearing is necessary to resolution of a charge of inadequate representation turns on an assessment of the record: if the petition's allegations cannot be resolved absent examination of evidence beyond the record, a hearing is required, *Clark v. Blackburn,* 619 F.2d 431, 432 (5th Cir.1980); if the matters relevant

---

**5.** Baldwin has exhausted state remedies on the three claims presented to the federal district court, *i.e.,* that his trial counsel was ineffective insofar as counsel failed to move for a new trial on the basis of the motel receipt, that his trial counsel inadequately prepared for presentation of, and presented, evidence in mitigation of punishment at the sentencing hearing, and that the Louisiana Supreme Court's proportionality review procedures are unconstitutional. *Daniels v. Maggio,* 669 F.2d 1075, 1076 (5th Cir. 1982); *Preston v. Blackburn,* 638 F.2d 788 (5th Cir.1981).

**6.** In anticipation of the possibility that this successive petition might be opposed or dismissed as an abuse of the writ, *see* Rule 9(b), Rules Governing Section 2254 cases in the United States District Courts, 28 U.S.C. foll. § 2254; *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *Paprskar v. Estelle,* 612 F.2d 1003 (5th Cir.), *cert. denied,* 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980), Baldwin argued to the district court and to this Court that the assistance afforded by the counsel representing him in his prior habeas corpus

proceeding was constitutionally inadequate. The State has not, however, suggested that this second petition should be barred as abusive. Neither did the district court consider the issue in its rejection of the petition. *Baldwin v. Maggio,* Civ.No. 82–1249 (W.D.La. May 20, 1982).

We find it unnecessary to comment either on the application of the doctrine to the circumstances of this proceeding, *compare Potts v. Zant,* 638 F.2d 727, 737 n. 14, *quoting Hardwick v. Doolittle,* 558 F.2d 292, 296 (5th Cir. 1977), *cert. denied* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978), or on the merits of Baldwin's responsive allegations, *but cf. Wainwright v. Torna,* 455 U.S. 586, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982). Unless abuse is clearly shown on the record, a dismissal under Rule 9(b) may be entered only after an evidentiary hearing on the issue of abuse. *Potts* at 747–48. The record does not clearly disclose that Baldwin has abused the writ. At this point in the litigation, and in the absence of an objection by the state, we see little sense in a redirection of judicial resources.

to a claim of inadequate representation are "spread fully on the record," *United States v. Curry*, 663 F.2d 572, 573–74 (5th Cir. 1981), further inquiry is unnecessary, *id.*

This claim may be resolved without recourse to a hearing. Baldwin's challenge is limited to the reasonableness of his trial counsel's decision to forgo a motion for new trial in view of what he argues is the "inescapable conclusion" of his innocence apparent on a simple comparison of the motel receipt with trial testimony establishing the time of the murderer's departure from Mrs. Peters' home.[7] All of the information that was relevant to Baldwin's trial attorneys' assessment of the motel receipt as a foundation for a motion for new trial is now before us. The record in support of the present petition includes a complete transcript of the trial testimony and a copy of the motel receipt; Baldwin's present counsel has ably directed our attention to the portions of the record bearing directly on his claim. Further debate on the significance of various passages in the trial record would neither aid nor enhance our evaluation. We turn to consideration of Baldwin's allegation of ineffective post-trial representation.

### B.

▮ The sixth amendment, applicable to the states through the fourteenth amendment, *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), entitles a criminal defendant to counsel reasonably likely to render and rendering reasonably effective assistance. *Baldwin II* at 946. The standard by which this court evaluates claims of ineffective assistance of counsel is clearly defined.

Constitutionally effective assistance of counsel is "not errorless counsel, and not counsel judged ineffective by hindsight, ...," *Herring v. Estelle*, 491 F.2d 125, 127 (5th Cir.1974). The determination of whether a counsel rendered reasonably effective assistance turns in each case on the totality of facts in the entire record. *See Washington v. Estelle*, 648 F.2d 276 (5th Cir.), *cert. denied*, 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981); *United States v. Gray*, 565 F.2d 881 (5th Cir.), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1978). Thus, we must consider a counsel's performance in light of "the number, nature, and seriousness of the charges ... the strength of the prosecution's case and the strength and complexity of the defendant's possible defenses." *Washington v. Watkins*, 655 F.2d 1346, 1357 (5th Cir.1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d [474] (1982). In this context, we recently recognized that while attorneys are not held to a higher standard in capital cases, the severity of the charge is part of the " 'totality of circumstances in the entire record' that must be considered in the effective assistance calculus." *Id.* *Gray v. Lucas*, 677 F.2d 1086, 1092 (5th Cir.1982).

▮ To establish a constitutional violation under this standard, a petitioner must

---

**7.** Baldwin's petition for habeas corpus relief did not allege that his trial counsel's performance was constitutionally inadequate because they failed to search for additional evidence buttressing the alibi suggested by the motel receipt. Rather, his petition, and his presentation in this Court, charged ineffective representation solely on the ground that his trial attorneys failed to act on new evidence which, viewed in the light of the trial record, conclusively demonstrates that Baldwin could not have been at the scene of the crime, at the time of the crime. The adequacy of trial counsel's investigation into the importance of the receipt was mentioned but once, and that only in passing, in Baldwin's appellate brief; no factual allegations were made in amplification of the charge. That one bare suggestion is wholly inadequate to raise a substantial claim of constitutional dimension, *Baldwin II* at 947; *United States v. Gray*, 565 F.2d 881, 887 (5th Cir.), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1978); *Rutledge v. Wainwright*, 625 F.2d 1200, 1205 (5th Cir.1980), *cert. denied* 450 U.S. 1033, 101 S.Ct. 1746, 68 L.Ed.2d 229 (1981). Even if this cursory allusion sufficed to state a claim cognizable in habeas corpus, it could not at this time be adjudicated: this Court cannot consider unexhausted charges raised for the first time on appeal. *Spivey v. Zant*, 661 F.2d 464, 477 (5th Cir.1981); *Messelt v. Alabama*, 595 F.2d 247, 250 (5th Cir.1979); *compare United States v. Curry*, 663 F.2d 572, 573 (5th Cir.1981).

demonstrate both an identifiable instance of seriously inadequate performance by counsel, and some actual, substantial disadvantage to the course of his defense resulting from that lapse. *Washington v. Strickland,* 693 F.2d 1243, 1258, 1262 (5th Cir. 1982) (Unit B, *en banc*); *Boyd v. Estelle,* 661 F.2d 388, 389–90 (5th Cir.1981); *Washington v. Watkins,* 655 F.2d 1346, 1359 n. 23, 1360 (5th Cir.1981). The inquiries are conceptually distinct, *Washington* at 1359 n. 23; the petitioner's failure to sustain either will result in a denial of the writ. *Boyd* at 389.

■ Evaluation of Baldwin's claim of ineffective representation in his attorneys' decision not to move for a new trial on the basis of the motel receipt must begin with an appreciation of the standard against which motions for new trials are measured in Louisiana courts. La.Code Crim.Pro. art. 851 (West) provides that

> The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.

> The court, on motion of the defendant, shall grant a new trial whenever:

> . . . . .

> (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;[8]

Art. 851(3) consistently has been interpreted to demand that the defendant must show "not simply whether another jury *might* bring in a different verdict, but whether the new evidence is so material that it *ought* to produce a different result from the verdict reached." *State v. Molinario,* 400 So.2d 596, 599 (La.1981) (initial emphasis in the original; second emphasis added); *State v. Motton,* 395 So.2d 1337, 1350 (La. 1981); *State v. Bice,* 390 So.2d 1270, 1271 (La.1980).[9] Baldwin contends that the new evidence he offers would, in light of trial testimony to his movements on the day of the assault and to the time of the murderer's departure from Mrs. Peters' residence, wholly exculpate him. On careful examination of the trial record, we are constrained to disagree.

The information provided by the receipt is limited. While it indicates that Baldwin checked into the White Sands Motel in El Dorado, Arkansas on April 4, 1978, it does not specify the time at which he checked in.[10] Baldwin's argument, therefore, depends on a construction of the trial record both to establish that the murderer left Mrs. Peters' home too late to arrive in El Dorado before midnight on April 4, and to eliminate the possibility that Baldwin checked into the White Sands prior to arriving at Mrs. Peters' residence. Neither proposition is supported by a fair reading of the record.

Trial testimony linked the murderer, and Baldwin, with a dark-colored van. Half a dozen witnesses stated that a van was parked in front of Mrs. Peters' home for

---

**8.** Baldwin's trial counsel acquired the receipt approximately five months after the close of trial. The State concedes for the sake of argument that the motel receipt is material evidence which could not have been discovered prior to the close of trial even in the exercise of due diligence.

**9.** The revising committee's note to art. 851 emphasizes that the section was phrased deliberately to "stress[ ] the basic requirement that the irregularities complained of in a motion for a new trial must have resulted in the doing of an injustice to the accused." La.Code Crim. Pro. art. 851, official revision comment. This

limitation of new trials to situations in which a convincing showing of injustice has been made is firmly established in Louisiana jurisprudence, *see id., citing* Acts 1928, No. 2, § 1, arts. 506, 508, 509 (repealed 1967); *State v. West,* 172 La. 344, 134 So. 243 (La.1931).

**10.** We assume the accuracy of the receipt for the purposes of this discussion. It is, of course, possible that the receipt was misdated, perhaps accidentally, because the person checked in shortly after midnight on April 4, 1978, and the room clerk had failed to change the date stamp promptly at midnight.

several hours on the night of the fourth. Two of those witnesses, Paul Thomas Rice and Robert Grisham, testified that they first noticed the van when they walked past Mrs. Peters' house at about 10:15 p.m. As they passed, Rice heard scuffling. He paused, then called Grisham back. Both men approached the house and looked into the lighted kitchen through an open window. As they watched, a man swung his arm, bending with the downswing as if striking a target on the floor. Circling and jumping as if to stay on target, the man struck repeatedly. Rice and Grisham decided they were seeing an interspousal quarrel, and resumed their walk to a nearby convenience store. Eight to fifteen minutes later, they returned.[11] Both noticed a man and woman standing in Mrs. Peters' yard near the van; the woman appeared to have something in her hand. Rice testified that he heard the man call "We'll see you later, Mrs. Peters", then watched them get into the van and head north. Grisham also testified that he saw them get into the van, but that he then turned his back and did not see the van pull away. Rice's and Grisham's testimony puts the assailant's departure at about 10:25 p.m. to 10:30 p.m. Their testimony was contradicted only as to the time of the van's departure by the recollection of another neighbor, Mrs. J.C. Hawkins. Hawkins stated that she noticed the van from the kitchen window of her home "catercorner" from Mrs. Peters' home and that she saw the van there at 11:10 p.m.

Baldwin admitted at trial that he was driving a dark van on April 4 and that he took his girlfriend with him on a visit to Mrs. Peters' home that night.[12] The van was seized by the police when Baldwin was picked up several days later in El Dorado. Subsequent search of the van by West Monroe police turned up a bank bag containing savings bonds and certificates of deposits in Mrs. Peters' name.

El Dorado, Arkansas, is approximately seventy miles north of West Monroe, Louisiana. Baldwin, relying exclusively on Hawkins' recollection that she saw the van outside Mrs. Peters' home at 11:10 p.m., argues that he could not have left West Monroe after 11:00 p.m. and arrived in El Dorado before midnight. He offers proof of his presence in El Dorado as irrefutable evidence of the truth of his claim that he left Mrs. Peters before the attack occurred. Baldwin does not argue that his arrival in El Dorado before midnight is inconsistent with Rice's and Grisham's testimony of the assailant's departure from Mrs. Peters' home at 10:30 p.m. We cannot say that it is, or that Hawkins' testimony to the van's presence should necessarily be accepted over Rice's and Grisham's testimony to the assailant's movements.

Even less certain conclusions can be drawn from the record as to Baldwin's whereabouts on April 4 prior to his visit to Mrs. Peters' home. Baldwin testified that he and his girlfriend, travelling together in the van, started out about noon from a park located about 50 miles north of Jackson, Mississippi, and arrived in West Monroe about 2:00 p.m.[13] The park superintendent testified that he noticed around 10:00 a.m. that Baldwin, the woman and the van were gone. Michelle Baldwin, the petitioner's stepdaughter, testified that she met him in West Monroe at about noon on the fourth. The record clearly discloses that Baldwin,

---

**11.** Rice and Grisham's testimony diverged somewhat on this point. Rice estimated the time elapsed as eight minutes; Grisham under direct examination stated that their return was about 15 minutes later. When confronted with Rice's statement on cross-examination, Grisham stated that he could not remember precisely, but would estimate that they were gone about 10 to 15 minutes.

**12.** Mrs. Peters was a longstanding friend of the Baldwin family. Timothy Baldwin met her in 1973, after she had already developed a close

friendship with his wife Rita. Mrs. Peters visited the Baldwin's home on occasional Sundays, Christmas and Easter; she was godmother to one of their twin boys, and remembered the boys' birthday with gifts of savings bonds. Timothy Baldwin frequently did handyman work for Mrs. Peters around the house.

**13.** Baldwin's recollection of this trip must be erroneous in some aspect: the park is about 200 miles from West Monroe.

after once arriving West Monroe, did not leave the town until after he stopped at Mrs. Peters' home. But a large, indeterminate amount of the day elapsed before Baldwin got to West Monroe. The record does not address, much less substantiate, the contention that Baldwin did not stop in El Dorado on his way to West Monroe.

Finally, Baldwin's conviction was supported by more than this circumstantial evidence. Michelle Baldwin testified that on the afternoon of the fourth, before his visit to Mrs. Peters, her father told her he was facing "Old Smokey." When she said that she didn't understand, he told her that he meant the electric chair. Michelle spoke again with Baldwin on April 7. By then, she was aware of Mrs. Peters' beating and death; believing it was to the intended assault on Mrs. Peters that her father had referred in his mention of "Old Smokey", she asked why he did it. She stated that Baldwin answered only, "She didn't suffer, it was fast." William Odell Jones, a friend and travelling companion of Baldwin, Baldwin's girlfriend and her children,[14] testified that before going to West Monroe, Baldwin told him that Mrs. Peters had money and that if he had to kill her to get it, he would kill her. Jones further testified that on the day after the assault Baldwin admitted to him that he had killed Mrs. Peters by striking her with his hand, a telephone, a frying pan, a television and a mixer, and had stolen her valuables.

On the record before us we cannot conclude that the motel receipt, if presented on a motion for new trial, would have exculpated Baldwin. It is not inconsistent with conclusions that he was at Mrs. Peters' home at the time of the assault, and was the assailant. It is not such evidence that, as required by the standard controlling the granting of a new trial in Louisiana courts, ought to have produced a different result. Baldwin was not prejudiced by his trial attorneys' decision not to pursue a motion for new trial on the strength of the receipt.

His request for habeas corpus relief on this ground must be denied.

### III.

Baldwin's second argument in support of his habeas corpus petition charges his trial counsel with incompetency in their preparation for the sentencing phase of his trial. He claims that they failed utterly to conduct a substantial, independent investigation into the one line of defense on which they stake their attempt to stave off the death penalty; he has supported his claim with affidavits attesting to his counsels' inattention to matters in mitigation of punishment, and to the substance of the evidence which he claims they would have found available if only they had looked. He asks for a new sentencing hearing, or, at the least, an evidentiary hearing on his allegations of inadequacy.

The constitutional norms by which effectiveness of criminal representation is measured extend equally to the guilt and sentencing phases of capital trials. *Washington v. Strickland,* 693 F.2d at 1250–58; *Williams v. Maggio,* 679 F.2d 381, 392 (5th Cir.1982) (Unit A en banc); *Davis v. Alabama,* 596 F.2d 1214, 1217 (5th Cir.1979) *(dictum), vacated as moot,* 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980); *United States v. Pinkney,* 551 F.2d 1241, 1246 (D.C. Cir.1976). Essential to the rendition of constitutionally adequate assistance in either phase is a reasonably substantial, independent investigation into the circumstances and the law from which potential defenses may be derived. *Washington v. Strickland,* 693 F.2d at 1250–52; *Rummel v. Estelle,* 590 F.2d 103, 104 (5th Cir.1979); *Davis v. Alabama,* 596 F.2d at 1217. That obligation to investigate, in the context of a capital sentencing proceeding, requires defense counsel to undertake a reasonably thorough pretrial inquiry into the defenses which might possibly be offered in mitigation of punishment, and to ground the strategic selection among those potential defenses on

---

**14.** The group wandered from Louisiana to Ohio to Florida and back. Their travels are chroni-

cled in part in *Baldwin II. Id.* at 945.

an informed, professional evaluation of their relative prospects for success. *Washington v. Strickland,* 693 F.2d at 1250–58; *Brooks v. Estelle,* 697 F.2d 586, 589 (5th Cir.1982); *Gray v. Lucas,* 677 F.2d 1086, 1093–94 (5th Cir.1982). Satisfactory acquittal of these responsibilities normally will be predicated on an independent search for witnesses with knowledge of the defendant's character, disposition to commit crimes and extenuating circumstances; beyond that, the extent of the investigation which will be considered "reasonable" cannot be exactly defined. Our cases make clear the far limits of the Constitution's mandate: while "counsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers," *Lovett v. Florida,* 627 F.2d 706, 708 (5th Cir.1980), neither is effective assistance given by a decision, tantamount to an abdication of the defendant's cause, not to investigate potential defenses at all. *Washington v. Strickland,* 693 F.2d at 1252, 1257; *Beavers v. Balkcom,* 636 F.2d 114, 116 (5th Cir.1981); *Gaines v. Hopper,* 575 F.2d 1147 (5th Cir.1978). Between those extremes, a determination of whether an investigation is reasonably adequate properly and necessarily "depend[s] upon a variety of factors, including the number of issues in the case, the relative complexity of those issues, the strength of the Government's case, and the overall strategy of trial counsel," *Washington v. Strickland,* 693 F.2d at 1251.

■ But the matter does not end with an evaluation of the adequacy of trial counsel's investigative efforts and the validity of his strategic choices. Not every breach of the duty to investigate lays the basis for the issuance of a writ of habeas corpus. A petitioner who seeks resentencing through allegations of a discrete failure by his trial attorney's investigation of, and preparation for, his sentencing hearing may not rest on proof only of the failure alleged and its constitutional dimension. He also shoulders the burden of proving that his counsel's ineffectiveness resulted in an actual and substantial disadvantage to the course of his defense. *Washington v. Strickland,* 693

F.2d at 1258–59, 1262; *accord Youngblood v. Maggio,* 696 F.2d 407, 409, (5th Cir.1983); *Williams v. Maggio,* 679 F.2d at 392; *Washington v. Watkins,* 655 F.2d at 1356, 1362–63 and n. 32; *Gray v. Lucas,* 677 F.2d at 1094. A failure to prove that he was prejudiced, like a failure to prove that his attorneys' efforts were inadequate, results in denial of the writ. *Id.* The steps are equally important, and equally essential.

■ Baldwin's argument does not analyze ambiguities in the question of the adequacy of his trial attorneys' preparation for his sentencing hearing. He claims that his is the clear case: his trial counsel simply did nothing to prepare for his penalty proceeding, he charges, and in result presented a far weaker case for amelioration of his punishment than they might have done.

Baldwin's attorneys put on a case for mitigation of punishment based on their client's good character in the years preceding his offense. Three witnesses close to the petitioner offered emotion-charged pleas for mercy. Baldwin's wife and his stepdaughters Michelle and Doris described his years of hard work and dedication to his family. The girls emphasized the love he had shown equally to his biological children and stepchildren, and the sense of moral responsibility he had instilled in them. His wife spoke of his deepening sense of failure and futility in the face of worsening financial problems and the heavy drinking he had turned to after years of near abstinence; she recalled his intelligence, compassion and capabilities, and spoke of their three young children who still needed a father.

Baldwin now argues that his trial counsel put on this case for want of anything else. He charges that they did not begin to prepare for the sentencing hearing until the guilt trial was underway, and that they did not seek out witnesses who could have added a broader, unbiased dimension to his plea. The State counters by defending his trial attorneys' presentation as a reasonable tactical choice. If the truth of the matter is, as Baldwin claims it to be, that his trial

attorneys simply failed to make a reasonably substantial investigation into the availability of mitigating character evidence, his attorneys are guilty of a clear violation of their duty to provide effective assistance. *Washington v. Strickland,* 693 F.2d at 1252; *Davis v. Alabama,* 596 F.2d at 1219, 1221. Baldwin's good character was the sole defense presented at the sentencing hearing. No trial strategy can validate a decision to forgo reasonably substantial preparation for and investigation into the defendant's one plausible line of defense. *Id.* If, on the other hand, his attorneys made a conscious, informed tactical decision to present only the testimony of his family members, their effectiveness can be judged only on an evaluation of the quality of that tactical choice and its underlying assumptions. *Id.* at 1253 n. 16, 1256; *Williams v. Maggio,* 679 F.2d at 392. The issue comes down to the truth of Baldwin's allegations that his attorneys took no steps to prepare for his sentencing hearing, and called his wife and daughters to the stand only in desperation. If our decision hinged on this question, we would be obliged to remand the matter to the district court for an evidentiary hearing. *Hickerson v. Maggio,* 691 F.2d 792, 795 (5th Cir.1982); *Rummel v. Estelle,* 590 F.2d at 105. But those inquiries are pretermitted by our decision that he has not shown actual and substantial prejudice to have accrued from his attorneys' course.[15]

Baldwin has offered the affidavits of eleven people who say they would have testified for him at his sentencing hearing if they had been asked. All attest to his good character, kind nature, and hard work. But none had known him for a prolonged period of time, and none had been in contact with him during at least the two years prior to his offense. Some knew him only slightly, as the courteous, industrious man who had put siding on their houses; others

had been neighbors or co-workers for a while in the mid-1970's. One was a cousin close to Baldwin while they were children; another was a parish priest whose services the Baldwins had attended in 1973 and 1974. Their testimony would have served only to corroborate the portrait of the man sketched by his wife and daughters. It would have been largely cumulative, and from sources whose relationships with Baldwin were, both in time and intensity, remote from his offense. *Brooks v. Estelle,* 697 F.2d at 589; *Williams v. Maggio,* 679 F.2d at 392; *Gray v. Lucas,* 677 F.2d at 1094. We cannot conclude that this evidence was of such significance that its omission worked an actual, substantial prejudice to the course of Baldwin's defense. For this lack of prejudice, his claim must be denied.

## IV.

Careful examination of Baldwin's charges of ineffective assistance has led us to the conclusion that the courses he claims his trial attorneys should have taken would not have been of substantial benefit to his defense. The judgment of the district court denying his petition for habeas corpus is accordingly affirmed.

AFFIRMED.

---

**15.** Baldwin also complains that his trial attorneys failed to prepare his wife and stepdaughters for their testimony at the sentencing hearing, that his attorney's closing argument was lackluster, and that he failed to mention that Baldwin had no prior record of violent crime. But he does not specify how his family's testimony might have been improved; neither does he deny that emphasis on the absence of violence in his criminal record would have served as well to underscore his prior criminal activities. As to the alleged deficiencies in the closing argument, we decline to embark on a course of regulation of rhetoric condemned not for impropriety, but for an absence of intensity.