David Dene MARTIN,
Petitioner-Appellant,

v.

Ross MAGGIO, Jr., Warden, Louisiana State Penitentiary, and William J. Guste, Jr., Attorney General of the State of Louisiana, Respondents-Appellees.

No. 81–3494.

United States Court of Appeals,
Fifth Circuit.

Aug. 15, 1983.

Richard E. Shapiro, Div. of Public Interest Advocacy, Dept. of Public Advocate, Trenton, N.J., for petitioner-appellant.

John J. Erny, Jr., Thibodaux, La., Asst. Dist. Atty., LaFourche Parish, for respondents-appellees.

Before BROWN, RUBIN and REAVLEY, Circuit Judges.

PER CURIAM:

In 1978 the State of Louisiana sentenced David Dene Martin to die for murdering four persons. In this habeas corpus action, filed after four years of legal action in state courts, he seeks invalidation of his conviction because of ten claimed violations of his federal constitutional rights. Having carefully reviewed the record to ensure that his conviction has been achieved constitutionally,[1] we find no error and, therefore, affirm the district court judgment denying the writ.

## I.

On April 10, 1978, a Louisiana jury convicted Martin of four counts of first degree murder.[2] The following day, after a separate sentencing hearing, the jury unanimously recommended that Martin be sentenced to death on each count. Louisiana law requires the sentencing jury to find at least one of the aggravating circumstances specified in La.Code Crim.Proc.Ann. art. 905.4 (West Supp.1983) before imposing the death sentence. Martin's jury found two: (1) he "knowingly created a risk of death or great bodily harm to more than one person," id. art. 905.4(d); and (2) he committed the offenses "in an especially heinous, atrocious or cruel manner." Id. art. 905.4(g).

On direct appeal the Louisiana Supreme Court, by a vote of four to three, affirmed the convictions and sentence. State v. Martin, 376 So.2d 300 (La.1979). That court denied rehearing by the same margin. Id. The United States Supreme Court denied Martin's petition for a writ of certiorari. Martin v. Louisiana, 449 U.S. 998, 101 S.Ct. 540, 66 L.Ed.2d 297 (1980) (Justices Stewart, Brennan and Marshall dissenting).

Martin then sought post-conviction relief in the Louisiana courts. His first petition was dismissed by a state district court on February 9, 1981. State v. Martin, Nos. 80074–76 (La.Dist.Ct. LaFourche Parish, Feb. 9, 1981). He then returned to the Louisiana Supreme Court. With two justices dissenting, that court denied Martin relief. State ex rel. Martin v. Blackburn, 392 So.2d 648 (La.1981).

Having exhausted his state remedies, Martin on February 10, 1981 filed a petition for writ of habeas corpus in United States District Court. The court stayed his execution and referred the case to a magistrate. On August 12, 1981 the district court, in a thirty-nine page opinion, denied Martin relief. Martin v. Blackburn, 521 F.Supp. 685 (E.D.La.1981). Martin appealed.

## II.

On August 11, 1977, David Martin's wife Gloria began to work in a restaurant lounge

---

1. See Bass v. Estelle, 696 F.2d 1154, 1162 (5th Cir.1983) (Goldberg, J., concurring).

2. At the time of the events relevant to this case, La.Rev.Stat.Ann.§ 14:30(West) provided:

"First degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm."

owned by Bobby Todd. The next day she had sexual relations with Todd; the following day she informed her husband of this fact. She refused Martin's request that she quit working for Todd. That night, Martin stole a friend's Colt Python .357 magnum pistol. The firearm was loaded with hollow-point bullets, and Martin later purchased an additional box of shells for it.

On August 13, Martin visited his next-door neighbor, Raymond Rushing. Martin told Rushing that he was going to shoot Todd. He explained that he was jealous of his wife's relationship with Todd. On August 14 Martin told another friend, Chester Golden, that his wife was working at Todd's restaurant and would not quit. He indicated that he had "a bone to pick" with Todd and had waited the last two nights outside Todd's restaurant for an opportunity to "get" Todd. Martin showed Golden the stolen pistol. He told Golden that, because he had stolen the gun from a felon, its theft would not be reported. Golden told Martin that he "looked pretty drug out" and had lost weight. Martin replied that he had been up for two nights and had not been eating.

That evening, according to accounts he later gave, Martin drove to the vicinity of the trailer in which Todd lived. He parked down the road from the trailer so he could approach it in the guise of a hitchhiker on foot. He entered the trailer and confronted Todd, who offered him a roll of bills. Martin ignored the money. Saying "I just want you to know my name," Martin shot Todd twice in the chest. He proceeded to shoot the three other persons in the trailer: Todd's bodyguard and two nude females. Martin inflicted multiple bullet wounds on each of the four. One of the women was first wounded in the abdomen. She told Martin she was in pain and begged him to "finish" her. He shot her in the head and killed her. Martin then took the rolls of money "to make it look like a robbery," and left.

Around 8:00 p.m., Martin returned to Golden's home. He was excited and asked Golden to take a ride with him. During the ride, he told Golden that he had killed four people at the restaurant. Martin said he had not touched anything and, although the authorities might suspect him, they had no proof that he committed the murders. Martin confessed to four more people that night. He told one of them, Pamela Wilson, that he had thrown the gun in a bayou. Martin was arrested a short time later. The sheriff who made the arrest told reporters for a local newspaper that Martin appeared "strung out on dope" at the time.

Martin's brother retained a Texas attorney with ten years' criminal trial experience and some experience with capital cases. The Texas attorney associated a Louisiana lawyer with limited criminal experience and no experience in capital offenses. Lead counsel was also assisted by an investigator who made several trips to the area of the crime.

Using the words "walk me or fry me," Martin told lead counsel at their first meeting to seek either a full acquittal or the death penalty. He later repeated this instruction to local counsel. Martin told lead counsel he had taken drugs on the night of the murders. Lead counsel arranged for Martin to be examined by Dr. Byrd, a psychiatrist. Martin told Dr. Byrd that he had taken PCP on the night in question. Dr. Byrd, therefore, discussed a "drug-related" defense with lead counsel.

According to Dr. Byrd, the effect of this type of drug on "the thinking capacity of the human being would raise substantive and serious questions about [Martin's] ability to formulate logical thoughts on or about" the night of the murders. He also concluded that the murders were "inconsistent with [Martin's] past history, except in the presence of a toxin such as LCD [sic] or PCP." The doctor, therefore, concluded that a drug-related defense would be medically "valid and credible" in Martin's case. He thought an intelligent decision about such a defense, however, required additional evaluation of Martin and further investigation of the drugs Martin had taken that night. These investigations were never pursued because Martin's counsel did not again communicate with Dr. Byrd.

Martin called Dr. Richard Garey, an expert on the effect of drugs, as a witness at the federal habeas hearing. Dr. Garey testified that one of the common effects of the use of PCP is "an amnesiac response, that is they don't remember either completely— complete amnesia, or it's fragmented, they remember part of what went on during their trip. And a lot of times they don't remember completely, and if it's fragmented, they'll remember things that happened an hour before but not two hours before." He added, "they seldom remember the event in very clear detail." It is possible for an individual who is under the influence of PCP to remember an event for a short time, then forget about it, but "it's not common." It happens "in approximately 10 percent of the cases."

Martin's lead attorney did no research to determine whether voluntary intoxication was a defense to first degree murder in Louisiana. Local counsel, who has since ceased to handle criminal cases, testified that he "got into" the question "real heavy," but his testimony exhibits substantial confusion about the legal questions involved. He testified that, to the best of his recollection, voluntary intoxication was not a defense.[3]

The intoxication theory was not pursued by Martin's counsel because they had decided to rely on another defense. This decision was never discussed with Martin. Indeed, counsel never even discussed the possibility of an intoxication defense with him. Lead counsel explained his decision as follows:

One, I was convinced that the defense of diminished capacity because of drugs was really not a defense that was there. I was not—I mean no one indicated to me any factors that would indicate that at the time of the offense Mr. Martin was intoxicated as a result of drug use . . . .

One thing that concerned me in that regard was the incident involving Mr. and Mrs. Martin's child and the birth of their child. There had been a child born to Mr. and Mrs. Martin with . . . brain damage. It appeared that those complications may very well have been related to drug use on the part of either Mr. Martin or Mrs. Martin.

And I was concerned that . . . any suggestion that [Martin] might have, either inadvertently or through negligence or engaging himself in unlawful activities such as the use of drugs, had been responsible for the serious complications to his child, may have seriously prejudiced Mr. Martin in the eyes of the jury.

Moreover, local counsel indicated that he and lead counsel were uncomfortable with the intoxication defense because, to invoke it, Martin would have to admit that he committed the murders.

Counsel chose instead to pursue the defense that Martin had not committed the murders. Lead counsel explained that, in his opinion, the physical evidence showed the victims "could not have been shot in that small trailer." Local counsel explained that he and lead counsel believed the defense to be tenable because the state's case would be "straight out circumstantial."[4] The jury was not convinced, however, and they convicted Martin on each count.

At the sentencing phase, the prosecution proffered all the evidence introduced during the guilt phase of the trial. Martin then called three witnesses. Donald Culpepper, head elder of the Seventh Day Adventist Church in Houma, testified that Martin moved to the area in 1979 and became involved in a counselling service for runaway youths and people with drug problems. According to Culpepper, Martin ac-

---

**3.** In fact, Louisiana law provides that voluntary intoxication that "preclude[s] the presence of [the] specific criminal intent . . . required" for conviction of first degree murder does provide a defense to that charge. La.Rev.Stat.Ann. § 14:15 (West 1974). See State v. Monroe, 397 So.2d 1258, 1269 (La.1981); State v. Youngblood, 235 La. 1087, 106 So.2d 689 (1958).

**4.** In fact, Martin's five confessions were each direct evidence of his guilt. See State v. Snedecor, 294 So.2d 207, 211 (La.1974). In objecting to a proposed jury instruction, Martin's lead counsel argued that, although taped confessions were direct evidence, those memorialized in other ways were only circumstantial evidence. Louisiana law recognizes no such distinction.

tively participated in the work of the clinic and counselled young people who had drug problems. Martin impressed Culpepper as a diligent and faithful worker. Martin became an active member of the Seventh Day Adventist Church. Culpepper testified that Martin even participated in the building of a new church; at one point, Martin continued working on the church even though he had a cast on his leg.

Culpepper also testified that in 1976 Martin married Gloria Pitre. In December 1976, they had a baby girl. Because Martin and his wife wanted to have a natural birth, Martin arranged to deliver the child with the assistance of two "ladies in the church who had assisted in the past in delivering babies." Complications arose during the childbirth, however, that resulted in brain damage to the baby girl.

Culpepper did not recall talking to Martin about his reaction to his daughter's injury but he knew both Martin and his wife were "quite upset" about it. Culpepper "understood from the people [he] talked to about it" that Martin blamed himself for the damage. Other evidence had suggested that the difficulty, which caused the child to cease breathing for a long period and caused serious brain damage, was not uncommon and might have been remedied by experienced medical attention. Martin left the church shortly after the birth of his daughter.

Martin's brother Dale testified that David went to public school until about the tenth grade and then dropped out. David subsequently obtained a G.E.D. degree, and, Dale thought, went to college for about a year. Dale Martin described his brother as a generous and unselfish person who had never been convicted of any crime. Dale thought that the petitioner blamed himself for his daughter's injury and, to his knowledge, never recovered from the incident.

Mary Edith Hill, Martin's final witness, was an assistant cashier and branch manager at a Houma bank. She had known Martin for about three years by the time of the trial, and she was very impressed with him. She indicated that Martin and his wife were for some time house parents at a home for girls and that "[t]hey were always trying to help everyone less fortunate than they were." Hill had loaned Martin money on several occasions, and had been repaid. She considered him to be a generous, nonviolent person.

The jury recommended the death sentence for each of the four murders. We now discuss separately each of Martin's claims of error.

### III.

The sixth and fourteenth amendments guarantee the defendant in a state criminal trial the fundamental right to effective counsel. *Vela v. Estelle,* 708 F.2d 954, 961 (5th Cir.1983); *Baldwin v. Maggio,* 704 F.2d 1325, 1329 (5th Cir.1983). Martin claims his counsel's failure adequately to investigate the intoxication defense abridged this right.

A defendant is not entitled to error-free representation. *Hayes v. Maggio,* 699 F.2d 198, 201 (5th Cir.1983); *Williams v. Maggio,* 695 F.2d 119, 123 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 1901, 77 L.Ed.2d 288 (1983). The Constitution does, however, guarantee the defendant "counsel reasonably likely to render and rendering effective assistance." *Vela,* 708 F.2d at 961; *Baldwin,* 704 F.2d at 1329; *Gray v. Lucas,* 677 F.2d 1086, 1092 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1886–87, 76 L.Ed.2d 815 (1983). Martin bears the burden of demonstrating by a preponderance of the evidence that he was deprived of this right. *Washington v. Strickland,* 693 F.2d 1243, 1250 (5th Cir.1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983); *Hayes,* 699 F.2d at 201–02.

In reviewing the quality of counsels' representation, we take care that the "finely ground lens of 20/20 hindsight" does not affect our vision. *Williams,* 695 F.2d at 123; *accord Tijerina v. Estelle,* 692 F.2d 3, 7 (5th Cir.1982); *Washington v. Watkins,* 655 F.2d 1346, 1356 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 479 (1982). The standard of competence re-

quired of trial counsel "is no higher in capital cases than in noncapital cases." *Bell v. Watkins,* 692 F.2d 999, 1008 (5th Cir.1982); *Washington v. Watkins,* 655 F.2d at 1356–57. Nevertheless, the seriousness of the charges against a defendant must be considered as part of the "totality of the circumstances" in ruling on a claim of ineffective assistance. See *Vela,* 708 F.2d at 965; *Baldwin,* 704 F.2d at 1329.

Because a defendant's trial "can be decisively affected by actions of defense counsel in preparing the case," we have insisted that "effective counsel conduct a reasonable amount of pretrial investigation." *Washington v. Strickland,* 693 F.2d at 1251; *accord Baldwin,* 704 F.2d at 1332; *Bell v. Watkins,* 692 F.2d at 1009; *Washington v. Watkins,* 655 F.2d at 1355; *Rummel v. Estelle,* 590 F.2d 103, 104 (5th Cir. 1979); *Davis v. Alabama,* 596 F.2d 1214, 1217 (5th Cir.1979), *vacated as moot,* 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980). The extent and scope of the required investigation depend on the "number of issues in the case, the relative complexity of those issues, the strength of the government's case, and the overall strategy of trial counsel." *Washington v. Strickland,* 693 F.2d at 1251; *accord Baldwin,* 704 F.2d at 1333.

The record does indicate that Martin's counsel failed to conduct a reasonable investigation into the intoxication defense. Despite Dr. Byrd's testimony about his conversation with lead counsel, that lawyer manifested no awareness when he testified at the federal habeas hearing of the evidence that Martin was intoxicated on the day of the murders. He failed to pursue the investigations suggested by Dr. Byrd as necessary to an intelligent decision concerning the intoxication defense. Both counsel apparently failed to familiarize themselves with Louisiana law on the availability of intoxication as a defense.[5] In sum, they rejected the defense without pursuing the

basic inquiries necessary to evaluate its merits intelligently.

Martin's instruction that his lawyers obtain an acquittal or the death penalty did not justify his lawyers' failure to investigate the intoxication defense. It is undisputed that the attorneys never discussed that option with him. Uncounselled jailhouse bravado, without more, should not deprive a defendant of his right to counsel's better-informed advice. "[M]eaningful discussion with one's client" is one of the "cornerstones of effective assistance of counsel." *Gaines v. Hopper,* 575 F.2d 1147, 1149–50 (5th Cir.1978).

Martin's counsel "failed to conduct a reasonably substantial investigation" into the intoxication defense because they had chosen to rely on another defense at trial. See *Washington v. Strickland,* 693 F.2d at 1254. While their decision to pursue only one of the available defense options does not, by itself, constitute ineffective assistance, "[t]he basis for judicial deference to such a choice . . . is eroded measurably." *Id.* at 1255. If our review of the record convinced us that counsel had relied on unreasonable assumptions or strategies in deciding not to pursue the defense, a finding of ineffective assistance would be warranted. *Id.* at 1256.

We need not decide whether counsel was ineffective, however, for that finding alone would not entitle Martin to relief. In addition to proving his counsels' shortcomings, a defendant asserting an ineffective assistance claim must demonstrate that his counsels' failings "worked to his *actual and substantial disadvantage.*" *Washington v. Strickland,* 693 F.2d at 1258 (emphasis in original) (quoting *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816, 831 (1982)). "A failure to prove that he was prejudiced, like a failure to prove that his attorneys' efforts

---

5. Our decisions make it clear that "a failure of counsel to be aware of prior controlling precedents in even a single prejudicial instance might render counsel's assistance ineffective under the sixth amendment." *Nelson v. Es-*

*telle,* 642 F.2d 903, 908 (5th Cir.1981) (emphasis omitted); *accord Nero v. Blackburn,* 597 F.2d 991, 994 (5th Cir.1979); *Cooks v. United States,* 461 F.2d 530, 532 (5th Cir.1972).

were inadequate, results in a denial of the writ." *Baldwin,* 704 F.2d at 1333.

■ Although the defendant is not required to produce evidence "to which he is unlikely to have access," he must "show what evidence could be uncovered in his favor" through adequate representation. *Washington v. Strickland,* 693 F.2d at 1262. "The issue should be squarely presented to a court as to what further investigation would have shown." *Beavers v. Balkcom,* 636 F.2d 114, 116 (5th Cir.1981). Only after the defendant thus demonstrates that he was disadvantaged does the burden shift to the state to show harmless error. *Washington v. Strickland,* 693 F.2d at 1262.[6]

■ Martin has failed to show that his defense was disadvantaged because he has failed to show that a reasonable investigation would have produced evidence that he lacked the specific intent to kill. The testimony of both doctors, Byrd and Garey, established only the possibility of such evidence. But *Washington* requires the defendant to show more than a *possible* detriment to the defense. We held in that case that defendants should usually be required to show what evidence a reasonable investigation would have produced. We reasoned that defendants are usually "better situated" to produce such evidence. *Id.* at 1262. This case demonstrates the wisdom of that conclusion.

Both Dr. Byrd and Dr. Garey testified for Martin at the federal habeas hearings. Presumably, either was available to conduct the additional evaluations necessary to establish finally whether there was technical

merit in an intoxication defense. If additional evaluation had convinced either doctor that Martin lacked specific intent to commit first degree murder, this evidence might have shown the habeas court that Martin suffered "substantial and actual disadvantage" when his counsel failed to authorize further medical evaluation. The doctors' testimony, however, established only the mere *possibility* that the intoxication defense had merit. This is insufficient to establish actual and substantial disadvantage.[7]

■ Martin's failure to demonstrate that his counsels' failings worked to his actual and substantial disadvantage is fatal to his claim. Our decision does not, however, rest on that ground alone. Even if Martin had established that adequate investigation would have produced evidence of an intoxication defense, he would still not necessarily be entitled to relief. The state would then have had the opportunity to demonstrate that the outcome of his trial would have been the same notwithstanding that evidence. *Washington v. Strickland,* 693 F.2d at 1262.

■ A thorough review of the record demonstrates that the state met this burden and showed that Martin would have been convicted even if his counsel had presented the intoxication defense. The circumstances of the crime preclude the use of an intoxication theory. Martin carefully planned the Todd murder for two days. He calculatedly posed as a hitchhiker when he approached Todd's residence. Martin's la-

**6.** Although the Supreme Court has granted the state's petition for a writ of certiorari in *Washington v. Strickland, see* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332, we think it unlikely that the Court will adopt a prejudice standard less stringent than that identified by this court. *See United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816, 831 (1982).

**7.** Martin's federal habeas hearings were conducted before we adopted the actual and substantial disadvantage requirement in *Washington.* Before that decision, the degree of prejudice required to establish ineffective assistance was "as yet unclear." *Washington v. Strickland,* 673 F.2d 879, 895–96 (5th Cir.)

(panel opinion), *vacated* 693 F.2d 1243 (5th Cir.1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983); *accord Washington v. Watkins,* 655 F.2d at 1362. Our decisions made it clear, however, that the defendant was required to show "*some* degree of prejudice." *Washington v. Watkins,* 655 F.2d at 1362 (emphasis in original); *accord Beavers v. Balkcom,* 636 F.2d 114, 116 (5th Cir.1981); *Mendiola v. Estelle,* 635 F.2d 487, 491 (5th Cir.1981); *Lovett v. Florida,* 627 F.2d 706, 709–10 (5th Cir.1980); *Buckelew v. United States,* 575 F.2d 515, 521 (5th Cir.1978). It is not, therefore, unjust to base our decision on Martin's failure to establish that he was disadvantaged. Even before *Washington,* our jurisprudence required such a showing.

ter recitals of the remarks he made to Todd at the time of the murder demonstrate that he recalled his reasons for planning the murders at the time he actually committed them.

By taking the money from the murder scene and by disposing of the gun, Martin demonstrated his lucidity immediately following the homicides. Both doctors testified at the federal habeas hearing that amnesia is a common symptom of PCP intoxication. Yet Martin was certainly not amnesiac immediately following the murders: he gave repeated, detailed confessions that night.

Given these facts, no jury would have accepted the intoxication defense. Even if we were to conclude, therefore, that Martin had demonstrated actual and substantial disadvantage resulting from his counsel's ineffectiveness, we would deny relief. The state has demonstrated that Martin would have been convicted even if he had presented the intoxication defense. Martin's conduct before, during and after the murders is simply inconsistent with the defense. Martin is not, therefore, entitled to relief on this ground. *See Washington v. Strickland,* 693 F.2d at 1262.

Martin also claims his counsel was ineffective at the guilt stage of his trial in failing to present evidence establishing that he was undergoing severe emotional turmoil at the time of the murders.[8] Martin argues that this evidence would have convinced the jury that he was guilty, if at all, only of manslaughter.[9] Specifically, Martin claims trial counsel should have investigated and introduced evidence of the personal difficulties Martin was experiencing in the

months before the murders. His daughter was injured at birth, causing him to question his spiritual convictions. He was unemployed and had encountered severe financial difficulties. Moreover, his wife was having an affair with Todd.

Martin's counsel cannot be faulted for failing to pursue the manslaughter defense; the evidence simply did not support such a theory. La.Rev.Stat.Ann. § 14:31 (West 1974), provides in relevant part: "Provocation shall not reduce a homicide to murder if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed." *See, e.g., State v. Howard,* 325 So.2d 812, 817 (La. 1976).

Each of the provocations identified by Martin took place some time before his commission of the offense. His daughter was born some eight months before the murders. Similarly, his unemployment was not a new development. His wife's infidelity with Todd took place two days before the murders. A reasonable jury would very likely have concluded that, by the time of the killings, Martin's blood had "cooled." His counsel cannot be criticized for not pursuing a defense of such questionable merit.[10]

## IV.

Martin contends that he was denied either the due process guaranteed by the fourteenth amendment or the right to confrontation guaranteed by the sixth and fourteenth amendments because he was not supplied with copies of the grand jury testi-

---

**8.** Originally, Martin argued that his trial counsel was ineffective in failing to present evidence of this emotional turmoil at the sentencing phase of his trial. By supplemental brief filed at Martin's express request, his appellate counsel withdrew that argument, substituting the present claim that trial counsel should have introduced the evidence at the guilt phase.

**9.** La.Rev.Stat.Ann. § 14:31 (West 1974) provides in relevant part:
   Manslaughter is:
   (1) a homicide which would be ... first degree murder ... or ... second degree mur-

der ... but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection.

**10.** We also note that Martin failed to raise this theory of his counsel's ineffectiveness before either the state courts or the district court. It is doubtful, therefore, that we should even consider the claim. *See Bass v. Estelle,* 696 F.2d 1154, 1159 (5th Cir.1983); *Burns v. Estelle,* 695 F.2d 847 (5th Cir.1983).

mony and pretrial statements of the witnesses who testified against him at the trial. Martin made a timely motion for these records. The state trial judge denied the request and also refused to examine the statements and grand jury testimony *in camera* to determine whether they contained statements inconsistent with the trial testimony or other information that would have been helpful to Martin.

Martin's claim seeks to establish a novel constitutional right far beyond any already recognized. He cites no direct authority for this claim. In *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), the Supreme Court, in the exercise of its supervisory power, held that the defense in a federal criminal prosecution is entitled to discover statements made by government witnesses to government agents. *See also Palermo v. United States,* 360 U.S. 343, 345, 79 S.Ct. 1217, 1221, 3 L.Ed.2d 1287, 1291 (1959). Concerned that the decision might be read too broadly, Congress enacted the Jencks Act, 18 U.S.C. § 3500 (1976), to clarify the scope of the government's disclosure burden. *Palermo,* 360 U.S. at 350, 79 S.Ct. at 1223, 3 L.Ed.2d at 1294.

■ However, the *"Jencks* decision and the Jencks Act were not cast in constitutional terms .... They state rules of evidence governing trials before federal tribunals; and [the Court has] never extended their principles to state criminal trials." *United States v. Augenblick,* 393 U.S. 348, 356, 89 S.Ct. 528, 533, 21 L.Ed.2d 537, 545 (1969). *Accord United States v. Beasley,* 576 F.2d 626, 631–32 (5th Cir.1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); *United States v. Lutz,* 621 F.2d 940, 948 (9th Cir.1980), *cert. denied,* 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1981); *United States v. Haldeman,* 559 F.2d 31, 77 n. 111 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Carrasco,* 537 F.2d 372, 377 n. 3 (9th Cir.1976). Because the *Jencks* decision and the Jencks Act apply only to federal criminal proceedings, Martin cannot avail himself of them to attack his Louisiana criminal trial.

■ *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1967), impose a constitutional duty on the prosecution to reveal exculpatory material in its possession. Nothing in the record, however, indicates that the state failed to disclose exculpatory materials. We find no constitutional error in the state court's ruling on the disclosure of witness statements.

V.

In his direct appeal to the Louisiana Supreme Court, Martin challenged the sufficiency of the evidence supporting the two aggravating circumstances found by the sentencing jury. That court found sufficient evidence to support the jury's finding that Martin "knowingly created a risk of death or great bodily harm to more than one person." It, therefore, declined to review the other aggravating circumstance. 376 So.2d at 312.

■ Martin contends that the court's review of only one of the two aggravating circumstances violates the eighth and fourteenth amendments. This argument was carefully considered, and rejected, in *Williams v. Maggio,* 679 F.2d 381, 386–90 (5th Cir.1982) (en banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983). In *Williams,* we held that the death sentence could be affirmed on review so long as one of the aggravating circumstances found by the jury was valid. "The aggravating circumstances which were not considered and limited by the appellate court do not serve as a basis for the death sentence." *Id.* at 390. Because the Louisiana Supreme Court affirmed one aggravating circumstance, its refusal to review the other did not abridge Martin's constitutional rights. *Id.*

■ *Williams* also requires that we reject Martin's claim that there was insufficient evidence to support the jury's finding that the murders were "especially heinous, atrocious or cruel." Because the Louisiana Supreme Court did not review the jury's finding of that aggravating circumstance, it

does not serve as the basis for Martin's death sentence. *Williams,* 679 F.2d at 390. Martin would not be entitled to relief even if we were to find insufficient evidence to support this finding.[11]

## VI.

After the presentation of evidence at the sentencing phase, the state trial judge read the statutory aggravating circumstances listed in the Louisiana Code of Criminal Procedure to the jury. La.Code Crim.Proc. Ann. art. 905.4 (West Supp.1983). He did not elaborate, however, on the statute in any way. Martin argues that the bare statutory language of article 905.4(d), "the offender knowingly created a risk of death or great bodily harm to more than one person," and article 905.4(g), "the offense was committed in an especially heinous, atrocious or cruel manner," was insufficiently precise to channel the jury's discretion. *See Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398, 406 (1980) (plurality opinion).

■ We need not consider Martin's claim as it relates to article 905.4(g). As discussed above, the Louisiana Supreme Court did not review the jury's finding of that aggravating circumstance and Martin's death penalty does not, therefore, depend on it. *Williams,* 679 F.2d at 390. Any error in the jury's conclusion that this aggravating circumstance was present is, therefore, harmless. We do consider the argument, however, as it relates to the jury's finding that Martin created a great risk to more than one person.

A state that wishes to impose capital punishment "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia,* 446 U.S. at 428, 100 S.Ct. at 1764, 64 L.Ed.2d at 406. The Constitution requires the state to "channel the sentencer's discretion by 'clear and objective standards'

that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing the sentence of death.'" *Id.* at 428, 100 S.Ct. at 1764–65, 64 L.Ed.2d at 406 (footnotes omitted).

■ We have not required, however, that the state implement the required channeling solely by carefully worded jury instructions. The instructions alone need not, as Martin claims, embody the "clear and objective standards" for the death sentence, for "the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner." *Gregg v. Georgia,* 428 U.S. 153, 195, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859, 887 (1976) (plurality opinion).[12]

On the two occasions that the Supreme Court has reviewed aggravating circumstances premised on the creation of risk to several people, it has sustained them because of proper appellate review. In *Gregg,* the petitioner claimed the phrase "great risk of death to more than one person" failed adequately to channel the jury's discretion. 428 U.S. at 202–03, 96 S.Ct. at 2939, 49 L.Ed.2d at 890–891. The court rejected the challenge because "while such a phrase might be susceptible of an overly broad interpretation, the Supreme Court of Georgia has not so construed it." *Id.* Accord *Proffitt v. Florida,* 428 U.S. 242, 256, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913, 925 (1976) (plurality opinion).

■ Like Florida and Georgia, Louisiana has judicially adopted a narrowing construction of this aggravating circumstance. In *State v. English,* 367 So.2d 815, 824 (La. 1979) (appendix), the court ruled that article 905.4(d) is applicable only when the defendant's "single consecutive course of conduct contemplates and causes the knowing creation of a great risk of bodily harm to

---

11. Although bound by this court's en banc decision in *Williams v. Maggio,* 679 F.2d 381 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983), Judge Rubin notes that he continues to adhere to the views expressed by Judge Randall's dissenting opin-

ion in that case. *Id.* at 396. Judge Reavley continues to adhere to Part IIB of that dissent. *Id.* at 402–05.

12. *See generally* Dix, *Appellate Review of the Decision to Impose Death,* 68 Geo.L.J. 97, 106–

more than one person." [13] As so construed, article 905.4(d) is adequately narrowed to prevent the arbitrary imposition of the death penalty. The Louisiana Supreme Court found the evidence sufficient to sustain the finding that Martin's conduct fell within the narrowed scope of that aggravating circumstance. 376 So.2d at 312. Martin's complaint that the jury instructions did not embody the narrowing construction is without merit. [14]

## VII.

Martin contends that one member of his venire was improperly excused for cause in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). *Witherspoon* permits potential jurors to be challenged for cause on the basis of reservations concerning the death penalty only if:

(1) . . . they would *automatically* vote against imposition of capital punishment without regard to any evidence that might be developed at trial in the case before them, or (2) . . . their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Id.* at 522–23 n. 21, 88 S.Ct. at 1777 n. 21, 20 L.Ed.2d at 785 n. 21 (emphasis in original); *accord Bell v. Watkins,* 692 F.2d at 1006. Moreover, a juror's "inability to deny or affirm any effect whatsoever" is insufficient ground for exclusion. *Adams v. Texas,* 448 U.S. 38, 50, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581, 593 (1980); *Bell,* 692 F.2d at 1006.

The juror in question, Ms. Royal Larose, was thoroughly examined about her willingness to impose the death penalty. She said repeatedly, "I don't know if I would vote for the death penalty." The district attorney then asked whether there were "any circumstances under which you would impose the death penalty." She replied: "Yes, if it was my child involved, and then I wouldn't be on the jury." When further questioned about whether she could return a death-penalty verdict, she stated "I don't know if I could do it" and "I don't know whether I could say 'kill.'" Then, this colloquy followed:

District Attorney: Let me ask you this, would you automatically vote against the imposition of capital punishment without regard to the evidence that might be developed at the trial?

Larose: Would I definitely be opposed to it?

District Attorney: Yes, mam [sic].

Larose: Yes, but I would not be opposed to just punishment, you know. But I don't think I could say, "kill."

After this reply, the district attorney challenged Ms. Larose for cause. Her final exchange with defense counsel was as follows:

Defense Counsel: This is my final question to you, and I ask you to think about it very carefully. Are you telling Mr. Erny that absolutely under no circumstances would you ever vote for the death penalty?

Larose: I don't think so really, I would vote, as I said, complete punishment,

08 (1979).

**13.** The cases indicate that the Louisiana Supreme Court has carefully scrutinized death sentences resting on a finding of this aggravating circumstance to maintain the integrity of the *English* construction. *See State v. Moore,* 414 So.2d 340, 348 (La.1982) (evidence insufficient; defendant killed mother by stabbing her while four month old daughter in house); *State v. Sonnier,* 402 So.2d 650, 658 (La.1981) (evidence sufficient; defendant executed two victims lying side by side with six rapid shots); *State v. Smith,* 400 So.2d 587, 593 (La.1981) (remanding to determine whether victim, when shot, was standing near crowd); *State v. Mon-*

*roe,* 397 So.2d 1258, 1274 (La.1981) (evidence sufficient; defendant stabbed first mother then daughter); *State v. Culberth,* 390 So.2d 847, 850 (La.1980) (evidence insufficient; defendant threatened, but did not pursue, victim's companion).

**14.** Justice Marshall has taken the position that the jury instructions must include the narrowing construction of potentially overbroad aggravating circumstances. *See Godfrey v. Georgia,* 446 U.S. at 436–37, 100 S.Ct. at 1769, 64 L.Ed.2d at 411 (Marshall, J., concurring). The other members of the court, however, have not as yet agreed. *See Williams v. Maggio,* 679 F.2d at 406 (Randall, J., dissenting).

and maybe I would like to whip them physically, but I don't know if I would want to put anybody's life out.

Finally, the state trial judge questioned Ms. Larose:

> Trial Judge: Mrs. Larose, I want to ask you a question, and the reason I am going to ask it in the way I'm asking it is because this is what the law says. The question asked in the law is: Would you automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial?
>
> Larose: Would I vote against capital punishment?
>
> Trial Judge: Yes, mam [sic].
>
> Larose: Yes, I honestly would. Now, I'm not saying that's the right decision. This is how I feel.

Our reading of the full transcript of Ms. Larose's testimony convinces us that she would, in fact, automatically vote against the death penalty. Martin complains that she did not respond to the judge's critical question framed in the language of *Witherspoon.* Instead, she reformulated the question as, "Would I vote against capital punishment," a question she answered in the affirmative. To require more would exalt form over substance. *See Williams v. Maggio,* 679 F.2d at 386.

## VIII.

Martin's next argument is based on a sentence in the opinion of the Louisiana Supreme Court affirming his conviction. The court said:

> It is clear from a reading of our Capital Sentencing Law that killing a victim in order to prevent that person from being able to report a separate crime (a kidnapping, an armed robbery, a separate murder, *et cetera*) is strictly condemned.

*State v. Martin,* 376 So.2d at 313 (La.1979). Martin cites this sentence as evidence that the court affirmed his death sentence based in part on a non-statutory aggravating circumstance not considered or found by the trial jury. The Louisiana Supreme Court, however, clearly did not rely on this factor in finding present in Martin's case the one aggravating circumstance required for imposition of the death sentence. The court affirmed the jury's finding that Martin created a risk of death or great bodily harm to more than one person. 376 So.2d 312. It then became unnecessary for the court to review even the other statutory aggravating circumstance found by the jury. *Id.*

The sentence Martin complains of was not part of the court's aggravating circumstances discussion. Rather, it appeared in the court's proportionality review of Martin's case with others in which that district's courts had imposed the death penalty. We are not aware of authority precluding the court from considering such a factor in undertaking proportionality review.

## IX.

Martin claims the Louisiana Supreme Court's comparative review of first degree murder cases by judicial districts, rather than on a statewide basis, violates the eighth amendment and the mandate of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), because it fails to ensure the fair and evenhanded administration of Louisiana's capital punishment statute. We rejected this exact argument in *Williams v. Maggio,* 679 F.2d at 394–95; *see also Baldwin,* 704 F.2d at 1326 n. 1. Louisiana's system of comparative review "provides adequate safeguards against freakish imposition of capital punishment." *Williams v. Maggio,* 679 F.2d at 395.[15]

## X.

Louisiana requires the sentencing jury to specify the aggravating circumstances that it finds. La.Code Crim.Proc. Ann. art. 905.7 (West Supp.1983). It does not require the jury to list mitigating circumstances it considered. Martin contends the Louisiana capital punishment scheme

---

**15.** The Supreme Court recently granted certiorari in a case presenting similar proportionality review issues. *See Harris v. Pulley,* 692 F.2d 1189 (9th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1425, 75 L.Ed.2d 787 (1983).

violates the eighth and fourteenth amendments to the United States Constitution because it does not require the sentencing jury to list the mitigating circumstances. The claim is meritless. The Constitution simply does not require such a procedure.

### XI.

Every case that comes to us is important to the parties concerned and to the integrity of our justice system. Every criminal case and post-conviction remedy proceeding literally affects the life of the accused. Yet in all other cases there is some possibility that if we reach an incorrect result our error, at least in part, may eventually be corrected. In a capital case, if we refuse relief and the state carries out its judgment, the result is irreparable. A human life is forfeit. Aware of these consequences, we are aware also of our duty: to identify error if it is present but to deny relief if the proceedings have conformed to the Constitution. We do not sit as a jury to reassess the verdict; we sit to enforce the nation's Constitution. We do not find constitutional error in the proceedings that resulted in Martin's death sentence. We conclude, therefore, that the state may carry out its judgment.

For these reasons, the judgment is AFFIRMED.